EUGENIE TURNER and GEORGE W. TURNER, Appellants, v. MARY BUTLER et al.

Division One, December 6, 1913.

1. **INSTRUCTIONS: Modified by Court: Right to Court's Ruling on Them as Presented.** A party has a right to the court's judgment on an instruction as he presented it. When the court modifies it, it becomes the court's instruction, for which the party is not responsible. If the court ought to have given the instruction in the form in which it was presented, then the modification is error of which the party has the right to complain. If it ought not to have been given as presented, there is no error in refusing it, and the court's modifying it cannot make the original refusal erroneous.

2. ———: **Will Contest: Burden of Proof: Preponderance of Evidence.** Where in a statutory will contest there were, aside from proponents' evidence, statements in the testimony of the contestants' witnesses tending strongly to prove the capacity of the testator, an instruction asked by contestants was properly refused which required the proponents to show the testator's capacity "by a preponderance of the evidence." Proponents' burden in such case is to establish testamentary capacity by a "preponderance of *all* the evidence," and to aid him with that burden he has a right to have the contestants' evidence considered as well as his own.

3. **UNDUE INFLUENCE: Will Contest: Burden of Proof.** The proponent in a will contest having shown that the will was executed with all the formalities prescribed by law while the

testator was of sound mind, it will then be presumed that it was his free and voluntary act. If the contestant then claims that the instrument represents the will not of the testator but of another, the burden lies upon him to prove it.

4. ———: ———: Filial Relations: Arising from Marriage. The law will not permit one to take advantage, for private gain, of relations of trust and confidence between the natural or lawful adviser and the advised, or the trustee and his beneficiary; indeed in such cases undue influence will frequently be presumed unless the act can be fully accounted for by another and adequate motive. But the law does not look with disfavor on the performance of filial offices, nor does it discourage the substantial recognition of their performance; and these principles apply as well to relations having their origin in marriage as in consanguinity.

5. ———: ———: ———: ———: Evidence. Evidence *held* insufficient in this case to warrant submission to the jury of the issue of undue influence, although a testator eighty years old and weakened in mind and body made what was proportionately a very large provision for his daughter, who with her husband lived near-by, the husband having acted, as he said, as testator's legal adviser and business manager for two years before his death.

6. EVIDENCE: Contest of Will: Mental Capacity: Conversations with Attorney: Exceptions. A practicing lawyer testified for contestants that the testator, who had been his friend for twenty years, came to see him four or five months before the date of the instrument in suit and talked to him about drawing a will, saying that he had one but was not satisfied with it. Testator never employed the witness to draw a will nor did witness charge any fee. Contestants asked him questions about this talk for the evident purpose of eliciting the opinion of witness as to his testamentary capacity, some of which were excluded by the court, the contestants excepting. The witness was afterward recalled, and the court said: "The court reverses its ruling heretofore made as to excluding the testimony of Mr. Sebastian." Contestants then asked witness whether from all the conversation he had with Mr. Butler at that time, business and social, he was of sound mind. Witness answered: "I don't think his mental condition was such on that day that it would have been proper for him to have made a will." Witness was then asked as to the conversation, and the court said: "If he was acting as attorney, he cannot state the communications made to him." No exception was taken to this and the witness was excused. *Held,* if there was any error in the court's action with reference to

the exclusion of this testimony, it is not saved for review in this court.

Appeal from Boone Circuit Court.—*Hon. N. D. Thurmond*, Judge.

AFFIRMED.

*Gillespy & Conley* for appellants.

(1)  The court should have submitted to the jury the issue of undue influence, as the evidence was substantial enough to raise a presumption of undue influence and was substantial enough to show undue influence without the presumption. (a)  Where one stands in a confidential or fiduciary relation to testator and a will is made in his favor there is a presumption of undue influence. Mowry v. Norman, 223 Mo. 476, 204 Mo. 189; Roberts v. Bartlett, 190 Mo. 702; Bradford v. Blossom, 190 Mo. 143; Dausman v. Rankin, 189 Mo. 708; Maddox v. Maddox, 114 Mo. 40; Hegney v. Head, 126 Mo. 619; Gay v. Gilliam, 92 Mo. 263; Dingman v. Romine, 141 Mo. 475. (b)  Undue influence need not be proved by direct and positive evidence, but it is sufficient if it can be shown by or inferred from the facts and circumstances in evidence. Mowry v. Norman, 204 Mo. 193; Roberts v. Bartlett, 190 Mo. 700; Bradford v. Blossom, 190 Mo. 139. Nor is it required that the acts of undue influence were exercised at the exact time of the execution of the will, but it is sufficient to show that such influence had been acquired previously and did operate at the time of the making of the will in the disposition of the testator's property. Mowry v. Norman, 204 Mo. 193; Taylor v. Wilburn, 20 Mo. 310. (2)  The evidence of Sebastian as to conversations with Butler at the time of the attempt to make a will should have been given. In stating that the rule of exclusion of confidential communications with attorneys and physicians does not terminate with the death of the client, care

must be taken to distinguish between cases where disputes arise between the client's representatives and strangers and those in which both of the litigants claim under the client. As to the latter class it would be obviously unjust to determine that the privilege should belong to one claimant rather than the other. Thompson v. Ish, 99 Mo. 176; Green v. Railroad, 211 Mo. 42; Graham v. O'Fallon, 4 Mo. 342; Russell v. Jackson, 9 Hare, 392; Scott v. Harris, 113 Ill. 447; Winters v. Winters, 102 Iowa, 53; Glover v. Patton, 165 U. S. 394; 4 Wigmore on Evi. sec. 2329; In re Shapter, 35 Colo. 578. Our statutes put physicians and lawyers on exactly the same grounds. Thompson v. Ish, 99 Mo. 177; Ex parte Gfeller, 178 Mo. 267. (3) The court erred in modifying plaintiffs' instruction 2. The modification consists in erasing the words "a preponderance of" and "the defendants have shown by such preponderance of" and inserting in lieu of the last "it has been so shown by the." The prejudicial error in the alteration is that whereas plaintiffs' instruction specifically directed the attention of the jury to the point of law that the burden of proof was on the defendants throughout the trial to establish unsoundness of mind, the alteration leaves the instruction in such form that they would not gather from it that such was the law. The instruction as asked was one given in the case of Mowry v. Norman, 223 Mo. 472, which was challenged in this court and was approved after discussion. The approved instruction is verbatim the same as the rejected instruction in this case.

*Harris & Finley* and *Whitecotton & Wight* for respondents.

(1) The court did not err in withdrawing the issue of undue influence from the jury. (a) The evidence was insufficient to raise a presumption of undue

influence, based on confidential relations. Campbell v. Carlisle, 162 Mo. 634; Seibert v. Hatcher, 205 Mo. 83; Dausman v. Rankin, 205 Mo. 83; Luebbert v. Brockmeyer, 158 Mo. App. 210. (b) The record discloses no evidence, circumstantial or otherwise, tending to show undue influence. Gibony v. Foster, 230 Mo. 106; Weber v. Strobel, 236 Mo. 649; Turner v. Anderson, 236 Mo. 523; Hayes v. Hayes, 242 Mo. 155. (2) There is no reversible error in the exclusion of the evidence of the witness Sebastian as to conversations had with testator while acting as his attorney. (a) No exception was saved to the ruling of the court on this point. Rearden v. Railroad, 215 Mo. 135; Wycoff v. Hotel Co., 146 Mo. App. 562; Roe v. Bank, 167 Mo. 426. (b) The evidence was not admissible under the statute. R. S. 1909, sec. 6362; Sweet v. Owens, 109 Mo. 7; Hamilton v. Crowe, 175 Mo. 634; Cross v. Riggins, 50 Mo. 335; Johnson v. Sullivan, 23 Mo. 474; Pinson v. Campbell, 124 Mo. App. 260; Henry v. Buddecke, 81 Mo. App. 365. (c) The excluded evidence could not have affected the verdict, and even if admissible should not work a reversal of the judgment. Hamilton v. Crowe, 175 Mo. 649. (3) The court did not err in modifying appellants' instruction numbered 2 as to burden of proof. Berger v. Storage Co., 136 Mo. App. 43; Clark v. Kitchen, 52 Mo. 316; Berry v. Wilson, 64 Mo. 164; Cramer v. Nelson, 128 Mo. App. 398. (4) The judgment is for the right party and should be affirmed. (a) The evidence entirely fails to justify the court in submitting the issue of mental capacity to the jury. Gibony v. Foster, 230 Mo. 106; Winn v. Grier, 217 Mo. 421; Archamboult v. Blanchard, 198 Mo. 384; Sayre v. Princeton, 192 Mo. 95; Story v. Story, 188 Mo. 110. (b) Where the verdict is for the right party the judgment should be affirmed even though errors may have been committed in the trial of the case. Shuepbach v. Gas Co., 232 Mo. 603; R. S. 1909, secs. 1850, 2082.

BROWN, C.—This is a statutory contest of the will of John Butler, late of Boone county, Missouri, by plaintiff, his granddaughter, against his **Statutory Will Contest.** widow, four children, Loutitia Phelan, Mary Woods, Martin Butler and Lizzie Vantine, a grandson, John Butler, only heir of a deceased son, William Butler, and Butler and Thornton Stewart, grandsons, who with plaintiff are the three heirs of a deceased daughter, Annie Butler Stewart. The executors are also made parties. The grounds of the contest are fraud, undue influence, alteration of the instrument after signature and unsoundness of mind.

At the close of all the evidence the court withdrew the issue of undue influence from the jury and refused all instructions offered by plaintiffs on this issue. The case was submitted on the sole issue of unsoundness of mind.

The will in question was made and signed December 8, 1895, when the testator was about eighty years of age. Although he had been a man of considerable vigor and business ability he had for some time been suffering from a general breaking down incident to old age, and had been practically confined to his house for some months previous to the making of the will. The evidence tended substantially to show that at that time he was not of sound and disposing mind, although some of the numerous witnesses introduced by contestants testified that they considered him all right in that respect.

The undue influence relied on is particularly charged in the petition to have been exerted by defendant Loutitia Phelan and her husband, Vincent D. Phelan, over the diseased and weakened mind and will of Butler while he was sick and under the influence of intoxicating liquors and drugs administered by them as well as other artifices without which he would not have signed and published the alleged will. As a matter of

fact the Phelans lived on Mr. Butler's land about two miles from his residence. Mrs. Phelan was the only child who lived in Boone county and she and her husband were frequently at the Butler home; and while Mr. Phelan did not wholly superintend the operations on the testator's farms, his advice was sought by the hands and his suggestions were followed in the absence of Mr. Butler. The latter does not seem to have known much about the technical description of lands. He seems to have been helpless in the presence of a map or survey, and depended entirely on Phelan, who seems to have been expert in such matters, and said that he could describe the entire real estate holdings of Mr. Butler without a map. Mr. Carter, Mr. Butler's attorney, when writing the will in question, had difficulty in describing the land and availed himself of the services of Mr. Phelan who was at the Butler home at the time, as was Mrs. Butler, who is shown by the evidence to have been taking an active part in Mr. Butler's affairs. Mr. Phelan had said to both his wife's sister-in-law and her son that he had been the business manager and legal adviser of Butler for two years before his death, although there is nothing in the evidence to indicate that he was a lawyer or had any special training in that direction.

In the latter part of February or the first part of March, 1906, Mr. Stephen March received word from Mr. Butler through some neighbors' to come to write a will. He found Mr. Butler in bed or in a reclining chair and said that he wanted Mr. March to rewrite a will. Mrs. Butler got the old will, the one in controversy here, and handed it to Mr. March. Mr. Phelan was not there. He got his map for Mr. March to look over and pick out certain pieces of land in which he wanted to make a change. March told Mr. Butler that he was not accustomed to that kind of work, and would rather have some one to assist him because he might get it wrong. Mr. Butler proposed Mr. W. W. Brund-

age, who did not come, and March suggested Mr. Phelan. Butler said, "He is the very man," and they telephoned for him and he came. In the meantime Mr. Butler asked Mr. March to read the will until he got to "Marty" and then stop. By that time Mr. Phelan was there. At Mr. Butler's direction Mr. March copied the will as far as the beginning of the devise to Martin E. Butler, and had finished when Mr. Phelan came. He then told him the trouble and Phelan said "I can almost locate that land without looking over the map;" that it was more trouble than he thought it would be. Mr. March after relating these facts in his testimony proceeded: "Uncle Johnny said, 'I want all in No. 17 west of the creek, Lick Fork Creek,' I think he says, 'to go to Marty.'

"Q. Had you put that in the will you were writing? A. No, sir. Mr. Phelan just made the remark, 'Uncle Johnny, don't you know, Uncle, that there is ten acres that does not lie due west of Lick Fork Creek, there is ten acres that is west of Perche?'

"Q. He had said he wanted all west of Lick Fork Creek? A. Yes, sir, in the 17th.

"Q. And Mr. Phelan asked him if he didn't know — A. That there was ten acres—

"Q. Lying west of the Perche? A. That didn't lie west of the Perche.

"Q. What did Mr. Butler say to that? A. It just appeared to kind of unnerve him. He got all out of sorts about it.

"Q. What did he say? A. He just said, 'Squire, you just burn up what you have written there and I will get Mr. Tom Carter back here and have him to fix this up.'

"Q. What else did he add when he told you to burn the papers? A. I put them in the stove. And after reflecting a little while, he says: 'No, that wouldn't do. I may pass away before Tom Carter gets

back here and you just let me rest two or three days and I will call you again and we will fix it up.'

"Q. Did he send for you any more? A. Not after that."

The map admitted in evidence shows that Perche Creek, for the most of the way, forms the west boundary of section seventeen but is deflected eastwardly and comes back to the line in such a way as to leave about ten acres of the section west of the creek and bounded on the west by the middle third of the section line. Lick Fork Creek enters the northwest quarter of the section from the north and runs in a southwesterly direction through that quarter, emptying into Perche Creek, leaving a considerable tract of land in the northwest corner of seventeen lying east of Perche Creek and west of Lick Fork. One would judge from the map that there are forty acres or more.

The will of John Butler begins as follows:

"I, John Butler, of Boone county, State of Missouri, being of sound mind and memory and of disposing disposition, and realizing the uncertainty of life and the certainty of death, do hereby make and publish this my last will and testament, hereby revoking and annulling all former wills made by me.

"First, I desire that all my just debts, if any, be paid out of my personal estate, by my executors hereinafter named, as soon after my death as convenient.

"Second. It is my will, and I direct that my beloved wife, Mary Butler, have the use and control, and receive the rents and profits of all the real estate of which I may die seized, during the term of her natural life, or as long as she remains my widow, and at her death or remarriage, I direct that my real estate be divided among my children and their descendants in the way and manner hereinafter set forth.

"Third. At the death or remarriage of my wife, Mary Butler, I direct, and it is my will, that my real estate be divided as follows:"

Then comes a devise to Martin E. Butler of 420 acres of land; to Mrs. Phelan of 602 acres; to his daughter Mary Woods, wife of P. S. Woods, 520 acres; to the grandson John Butler, son of William Butler, 240 acres; to the grandson Butler Stewart, 120 acres; to the grandson Thornton Stewart, 150 acres; to the granddaughter, Eugenia Turner, the plaintiff, 80 acres. The remainder of the real estate, consisting of about 700 acres, was then devised to be sold upon the death or remarriage of his wife and the proceeds to be divided between the three children Martin E. Butler, Loutitia Phelan and Mary Woods in equal parts.

The contestants introduced as a witness C. B. Sebastian, a practicing lawyer, who testified that he had known John Butler for twenty years before his death and saw him in July or August, 1905, when he came to his office to consult about writing his will, and said he had a will but was not satisfied with it. The following questions were asked, and answers given by him:

"Q. Did you act as attorney for Mr. Butler and receive a fee for it? A. No, sir. Q. You didn't advise with him, in the capacity of an attorney? A. I think I did."

By Mr. Whitecotton (for defendants): "We object to any conversation between attorney and client."

The court made no ruling but said: "You might examine him further." In answer to questions by Mr. Whitecotton the witness said: "Uncle Johnnie and I were particularly friendly and talked about a great many matters and he discussed the question with me about the will, but the will was not written. He was to come back at another time and nothing was done that day, except to have a conversation in regard to it. . . . He didn't seem to have any very clear idea of what he wanted then. He was not satisfied with the will that was written and wanted another will but was not clear about what he wanted done. He arranged with me to come back again but never did so."

By Mr. Conley (for contestants) : "I will get you to state whether he appeared to understand the nature and extent of his property?"

By the court: "I have not passed on the other question. Objections sustained." Defendants excepted.

Witness continued: "In my talk with Mr. Butler, I was not able to get clearly what he wanted done; he didn't seem to be clearly of any opinion as to what he wanted done and I suggested to him to think the matter over carefully and come back."

By Mr. Gillespy: "Is that the only reason. Mr. Sebastian, why you didn't write the will that day?"

By Mr. Whitecotton: "We object to that as immaterial." Which objection was by the court sustained and plaintiffs excepted.

By Mr. Gillespy: "I will ask you if the reason that you didn't write it was that Mr. Butler was—"

By Mr. Harris (for defendants) : "We object." Which objection was by the court sustained, and plaintiffs excepted.

By Mr. Gillespy: "I will ask you if Mr. Butler had the capacity, on that occasion, to make a will and make proper disposition of his property?"

"A. Physically he was very weak, and mentally he was not very clear. I mean by that that his statements in regard to what he wanted to do were somewhat conflicting and confused. I thought it best not to write the will."

By Mr. Whitecotton: "We ask that the latter part of the answer be stricken out as not responsive to the question and improper."

By the court: "Motion sustained as to 'I thought it best not to write the will.'" Plaintiffs excepted.

Questioned by the court, the witness stated that before that time he had not been attorney for Mr. Butler, who had only consulted him as a friend. That on this occasion he talked about his will and gave him

some ideas about it but was not very clear about it. Had witness written the will he would have charged for it. He said he would come back some other time. Mr. Butler did not employ him.

The foregoing includes all the exceptions taken by the plaintiffs to rulings of the court relating to the examination of Mr. Sebastian upon the question of the testamentary capacity of Mr. Butler. He was afterwards recalled for further examination, when the court said: "The court reverses its ruling heretofore made as to excluding the testimony of Mr. Sebastian," and the following question and answer followed:

"Q. I will ask you then, Mr. Sebastian, if, from all the conversation which you had with John Butler in your office at that time, whether sociably or in regard to business, as to whether or not he was of sound mind or not? A. I will answer that in this way. I don't think his mental condition was such on that day that it would have been proper for him to have made a will."

The witness was then asked as to the conversation between him and the testator at the time, and the court said: "If he was acting as attorney, he cannot state the communications made to him." No exception was taken to this statement or ruling, and the witness was excused.

In submitting the question of testamentary capacity to the jury the contestants asked the following instruction:

"2. In determining the issue of sufficient soundness of mind or testamentary capacity possessed by the testator to make a will, before you can find in favor of the proposed will you must believe from a *preponderance of* the evidence that, at the time of the signing and execution thereof the said John Butler had sufficient understanding to fully comprehend the nature of the transaction that he was engaged in, the nature and extent of his property, and to whom he

desired to give and was giving it, without the aid of any other person, and unless *the defendants have shown by such preponderance of* evidence that he did possess all of these requisites, you should find this issue in the negative and against the will.''

This was refused by the court in the form asked. The court then modified it by striking out the words italicized and inserting in lieu of the last group so stricken out the words ''it has been so shown by the.'' There was a verdict establishing the will. The appellant assigns the following errors.

''1.   The court erred in giving instruction 2 for defendants, being a peremptory instruction on undue influence, and in refusing plaintiffs' instructions 3 to 10 inclusive, all on undue influence.

''2.   The court erred in rejecting the evidence of Sebastian as to conversations with Butler at the time he consulted him about writing the will.

''3.   The court erred in modifying plaintiffs' instruction 2 and omitting the only specific declaration in the instructions that the burden of proof of the issue of unsoundness of mind lay with the defendants.''

I.   We will first consider the question whether the court committed error in refusing the second instruc-

**Modified Instructions.**

tion requested by the appellants in the form in which it was asked; for it is not contended that it was erroneous as given. The appellants contended that they had the right to the court's judgment on the instruction as they presented it, and that when modified it became the court's instruction, for which they were not responsible, and this is undoubtedly true. [Jordan v. Transit Co., 202 Mo. 418, 431; Maxey v. Railroad, 95 Mo. App. 303, 311; Meyer v. Railroad, 40 Mo. 151.] If the court ought to have given the instruction in the form in which it was

presented, then the modification was error of which the contestants had the right to complain. If it ought not to have been given in that form, there was no error in refusing it, and whatever the court may have afterwards done in the way of patching it up could not have made such action erroneous. Should the court have refused the instruction in the form in which it was asked? The appellants, insisting on a negative answer to this question, point out the fact that it is substantially copied from an instruction which was well considered and approved by this court in Mowry v. Norman, 223 Mo. 463, 472. The question upon that instruction as upon this was whether the burden was upon the proponent of the will to establish the testamentary capacity of the testator by "a preponderance of all the evidence," and the court held that it was, and to the general principle so announced we still adhere. In the subsequent case of Gibony v. Foster, 230 Mo. 106, 131, we said: "In Sehr v. Lindemann, 153 Mo. l. c. 288, it was expressly ruled that upon making out a prima-facie case by the proponents of the will, it then devolved upon the contestants to establish incompetency or undue influence." The use of so strong a word as "establish" in that connection suggested that, in the opinion of the court, there might be some point at which the burden of proof would change from one side to the other, so that, when the proponent had lifted his "burden of proof" to the height of a "prima-facie case," the contestant must come in and elevate it still higher before he could defeat the probate of the will. In Bensberg v. Washington University, 251 Mo. 644, our attention was again directed to the same subject, and we pointed out that the "prima-facie case" arose upon the introduction of the evidence required by the statute to be introduced to probate the will. But, as we said in that case, when the testimony is all in for both proponent and contestant, it must be considered

**Burden of Proof: Preponderance of Evidence.**

together and the question remains for the jury whether the proponent has sustained the burden of proving the execution of the will, including the fact of testamentary capacity at the time it was signed and published. How this burden may be borne in the first instance is fixed by the statute, but when the statutory evidence is not forthcoming, or its effect has been weakened by the contestant until it no longer preponderates, the statute still suggests the only rule which can meet the exigencies of the trial. It provides that the evidence must be sufficient to prove the will on a trial at common law. We have already had occasion to say (Bensberg v. Washington University, supra) and now take occasion to repeat that these evidential rules have their foundation laid deep in the policy of the common law as well as in the legislative policy of this State to permit, to the fullest extent consistent with the public welfare, the testamentary disposition of property, and in the corresponding obligation to protect the individual acting upon such permission, by the application of the cautious and safe methods of the common law to inquiries which may result from any attempt to use the counterfeit presentment of such action in furtherance of wrong.

While we think that the appellants were entitled to an instruction telling the jury in some form easily understood that the burden rested upon the defendants to prove the testamentary capacity of the testator by a preponderance of the evidence, there is, in our opinion, a vice in the one we are considering which fully justified the court in withholding it from the jury. It told them with reference to those things which are generally considered the mental requisites of testamentary capacity, that "unless the defendants have shown by a preponderance of evidence that he did possess all of these requisites, you should find this issue in the negative, and against the will." The merit of this feature of the instruction consists in the fact that it

was substantially copied from one that was expressly approved by this court in Mowry v. Norman, which we have already cited. The real difference is, that while in that case it was perfectly proper, in this case it is improper and misleading; for statements relating to these very matters tending strongly to prove the capacity of the testator, and which were no doubt highly satisfactory to the proponents of the will, and were presented by them to the jury with greater confidence for that reason, occurred in the testimony of the contestants' witness. Were this an ordinary suit, in which the burden of proof rested throughout upon the plaintiff, and the defendant had introduced no evidence, but had depended on that of the plaintiff, an instruction of this character would have been at least misleading; and the same construction is called for in this case. This court has recognized the difference in the effect of the same facts depending upon whether they are proven by the evidence of one party or the other (White v. Railroad, 250 Mo. 476, and cases cited), and what is more natural than that a jury when told that the *defendant,* to recover, must have shown a fact by a preponderance of evidence, should take the court at its word, and not be satisfied when the same fact has been shown by the plaintiff? The trial court took this view, and we see no error in its refusal of the instruction as asked and no error is suggested in it as it was finally given.

II. The proponent having shown that the will was executed by the testator with all the formalities prescribed by law while the testator was of **Undue Influence.** sound mind, it will then be presumed that it was his free and voluntary act; for the ability to consider and determine is a fundamental characteristic of mental soundness. If the the contestant then claims that the instrument proposed does not represent the will of the testator, but the will of another, substituted by fraud or by force either physical or intellectual, the burden lies upon him to prove

it. In this case the contestant has undertaken to sustain this burden principally upon a foundation consisting of a confidential relation of Mr. Phelan, the husband of one of the principal beneficiaries, toward the testator, and the fact that Mrs. Phelan received perhaps twice as much as either of his children.

It is true that the law will not permit one to take advantage of those intimate relations of trust and confidence which it recognizes between the natural or lawful adviser and the advised, or the trustee and his beneficiary, to use the influence incident to his dominant position for the purpose of private gain. So jealous is it in this respect that in such cases undue influence will frequently be presumed unless the act can be fully accounted for by another and adequate motive. But the law does not look with disfavor on the loving performance of those filial offices which, while not exacted by it, are the real rewards of parental solicitude and sacrifice; nor does it discourage the substantial recognition of those affectionate services. These principles apply as well to relations having their origin in marriage as in consanguinity; and confidential relations of this character may often explain why the testator has desired to bestow generously upon the beneficiary of his will. [Lamb v. Lippincott, 115 Mich. 611.] In this case the testator was old, and greatly weakened in mind as well as in body. While this should make us more careful in our scrutiny of the influences that surrounded him and were operative in suggesting the disposition he should make of his property, there is nothing in it to justify the courts in confining him more closely to conventional methods in its distribution than they would were he in the full vigor of his prime. Once given the testamentary capacity, his weakness is only to be considered as an element calculated to contribute to the success of any improper influence shown to have been brought to bear upon him.

*Filial Relation: Marital.*

In the light of these principles, we have carefully examined this record for evidence more consistent with the theory that the will of Mr. Butler was the product, to any extent, of improper or "undue" influence operating upon him at the time it was made, than with the theory that it was the product of his own volition, unaffected by any influence from which the law should protect him. We have considered that he was in a condition to be readily susceptible to such influences; that his provision for the Phelans was very large in proportion to the amounts bestowed upon his other heirs; that they occupied a position with relation to him and his business as intimate and commanding as Mr. Phelan could have intended, under the circumstances, to express by the statement that he was his legal adviser and business manager; and that they had never, like his other children, left the neighborhood in which he resided, and were ready and willing to come at his call with advice and assistance. While some of these things would, under normal conditions have a tendency to explain the disposition of Mr. Butler to deal generously by them, they might also give them vantage ground from which to work upon his weakness; but we have failed to find anything in the evidence tending to show that they used any such advantage, or solicited or advised, directly or indirectly, any disposition contained in the will. It is true that Mr. Phelan was present at its making, and, when requested, rendered valuable assistance in describing the land, for which service he was peculiarly equipped, but Mr. Butler had excellent independent legal advice and assistance in charge of the matter, and it was the province of his lawyer to direct and utilize the activities of Mr. Phelan, which he evidently did. The only instance in evidence in which the Phelans or either of them subjected themselves to criticism in connection with Mr. Butler's testamentary activities was at the time of the March incident, the lat-

ter part of February or first part of March, after the
making of the will in controversy. He then evidently
had a desire to change the will in favor of his son
Martin, or "Marty," as he affectionately called him.
He had, at the suggestion of Mr. March, procured the
presence of Mr. Phelan to assist in describing the
lands in the new will. Mr. March had copied the old
will down to the place where it mentioned Martin, when
the old gentleman said, "I want all west of the creek,
Lick Fork Creek, to go to Marty." The will in con-
troversy had already devised all that part of the north-
west quarter of section seventeen lying east of Perche
Creek to Mrs. Phelan, and the change proposed would
give a large portion of that quarter section to Martin.
Mr. Phelan immediately took notice, and said: "Uncle
Johnnie, don't you know that there is ten acres that
does not lie due west of Lick Fork Creek, there is ten
acres that is west of Perche." It was apparently an
innocent remark, but "it just appeared to kind of un-
nerve him. He got all out of sorts about it. He just
said, 'Squire, you can burn up what you have written
there, and I will get Mr. Tom Carter back here, and
have him fix this up.'" Mr. March put the papers in
the stove, and after reflecting a little while Mr. Butler
said: "No, that won't do. I may pass away before
Tom Carter gets back here, and you just let me rest
two or three days and I will call you again, and we will
fix it up."

That Mr. Phelan, on this occasion, interfered in
his own behalf there can be no doubt; that Mr. Butler
desired to give to the son who still lingered in his
heart as the child "Marty," the particular parcel of
land that lay in the triangle between Perche Creek and
Lick Fork is plain; and that at the first intimation that
Mr. Phelan was taking notice of his newly formed pur-
pose, he should have become so disturbed as to be
unable to proceed under the conditions that then sur-
rounded him, is so suggestive that, had it occurred at

the time of or before the preparation of the will now before us, we would have no hesitation in coming to the conclusion that it should have been submitted to the jury upon the issue of undue influence. But, as we have already seen, it is not the influence that the law denounces, for that may grow out of the very virtues which it most commends, but it is the improper use of that influence. The circumstance just related not only suggested the existence of such an influence, but also had a tendency to suggest that it was operative in preventing a change in the will. When we attempt, however, to apply it to the execution of this will some two or three months before, the circumstance, standing alone as it does, loses its evidential character, and sinks to the level of mere suspicion. We do not think the court could have done otherwise than it did in withdrawing the issue of undue influence from the jury.

IV. The only remaining question relates to the assignment that "the court erred in reject-

Evidence of Conversations. ing the evidence of Sebastian as to the conversation with Butler at the time he consulted him about writing the will."

As a matter of fact Mr. Sebastian was permitted to testify with considerable freedom as to his conversation with Mr. Butler in July or August, 1905, in which, among other things, the writing of a will for Mr. Butler was mentioned. He said that Mr. Butler was not clear enough about what he wanted done so that he could understand it, and did not seem to be clearly of any opinion as to what he wanted; that physically he was very weak and mentally was not very clear, so that his statements in regard to what he wanted to do were conflicting and confused; that from all the conversation that they had at that time both of a social nature and in regard to business he did not think Mr. Butler's mental condition was such at the time that it would have been proper for him to have a will made. At the time he made this last statement the witness was asked

what the conversations were upon which he based this statement, and the court said, without any objection being made, ''if he was acting as attorney, he cannot state the communications made to him.'' No exception was taken to this statement, and the witness was excused without answering. The circumstance impresses us that the contestants, having got what they wanted from the witness, deliberately refrained from pressing the matter further by exceptions or otherwise, and this impression is strengthened by the consideration that further pressure might weaken the favorable result already attained. Realizing, however, that the contestants and their attorneys may disagree with our conclusion upon that point we will examine the exceptions taken by them in the examination of Mr. Sebastian, for the purpose of judging whether the action of the court was erroneous in the sense charged in the assignment of error we have just quoted.

The first exception of this character was to the remark of the court: ''I have not passed on the other question. Objections sustained.'' With a little aid from an active imagination we may infer that this remark applied to the following statement which had been previously made by an attorney of the defendants: ''We object to any conversation between attorney and client.'' It was not limited to any question that sought information about any statement made by Mr. Butler connected with professional matters under discussion. It assumed the relationship of attorney and client, and covered like a blanket anything they might have said upon any subject. It reached no question in the case. Nor did the court, in sustaining the objections to questions asked Mr. Sebastian as to his reasons for not writing the will that day, indicate that it intended to exclude any statement made in the conversation between the witness and his alleged client. This objection was made and should have been sustained on the ground that the testimony was ''imma-

terial.'' The processes of Mr. Sebastian's mind was not the matter at issue. The court was trying the condition of Mr. Butler's mind. The same suggestion applies to the action of the court in striking out the statement of the witness that he thought best not to write the will. None of these matters involved the admissibility of any statement made by Mr. Butler in the conversation with Mr. Sebastian, and the action of the court upon them was irrelevant to that question.

This view makes it unnecessary to express an opinion as to the confidential character of the talk between Mr. Butler and Mr. Sebastian about writing a will. If the plaintiffs had any intention to preserve this question for the consideration of the appellate court they abandoned it at the time when an exception would have been effective for that purpose; thus retaining all the advantages accruing to them from the general statements of the witness, and avoiding the danger of weakening them by a disclosure of the language used. There was no prejudicial error shown in the action of the court in this respect.

For the reasons stated the judgment of the circuit court is affirmed.

PER CURIAM.—The foregoing opinion of BROWN, C., is adopted as the opinion of the court. All of the judges concur.