## ROBERT S. MARTIN, Administrator, Appellant, v. ORVILLE C. UPSON et al., Respondents.

**St. Louis Court of Appeals, February 2, 1915.**

1. **CONVEYANCES: Wills: Granting and Testamentary Capacity.** Presumptively, at least, a higher degree of mentality is required to execute a deed than to make a will.

2. **UNSOUND MIND: Evidence.** The fact that one shows signs of grief over the death of his brother is no evidence of any impairment of his mental faculties.

3. **CONFIDENTIAL RELATIONS: Undue Influence: Burden of Proof.** Where a confidential relation exists between a benefactor and a beneficiary, the burden is upon the latter to show that the benefaction was not the result of undue influence on his part.

4. ————: ————: **Sufficiency of Evidence.** In a suit to set aside a release of a deed of trust given to decedent to secure payment of the purchase price of land purchased from him by defendant, who was his nephew and with whom he resided, *held* that the trial court's finding, refusing to set aside the release on the ground of mental incapacity of decedent, was correct, under the evidence, even though the relations between the parties be regarded as confidential (which is not decided).

5. **GIFTS: Consideration.** Where one releases a deed of trust, for the purpose of making a gift of the secured debt to the mortgagor, the fact that there was no valuable consideration for the release affords no ground for cancellation of the same in equity.

6. **APPELLATE PRACTICE: Equity Suits: Review.** The appellate court will defer largely to the findings of fact of the trial court in equity cases.

Appeal from Lincoln Circuit Court.—*Hon. B. H. Dyer,* Judge.

AFFIRMED.

*Charles Martin* and *W. A. Dudley* for appellant.

(1) Under the circumstances of this case the burden of proof was upon the defendant to show the fairness and good faith of the transactions. Cornet v. Cornet, 248 Mo. 234; Armstrong v. Logan, 115 Mo. 465; Obst v. Unnerstall, 184 Mo. 383; Miller v. Simon, 72 Mo. 669; Bogie v. Nolan, 96 Mo. 85; Caspari v. Church, 82 Mo. 649; Holloway v. Holloway, 77 Mo. 392; Street v. Gass, 62 Mo. 226; Yosti v. Laughran, 49 Mo. 594; Dausman v. Ranken, 189 Mo. 677. (2) There was no consideration for satisfaction of the deed of trust. In fact it was admitted that Orville C. Upson paid nothing on the $4000 debt. Under such circumstances a court of equity will decree the transaction null and void and restore the parties to their original rights. Holmes v. Frest, 9 Mo. 200; Freeland v. Eldridge, 19 Mo. 325; Railroad v. Brown, 43 Mo. 294; Cadwallader v. West, 48 Mo. 483; Yoste v. Laughran, 49 Mo. 594; Obst v. Unnerstall, 184 Mo. 383.

*R. H. Norton* for respondent.

ALLEN, J.—This is a suit in equity to cancel and annul the release of a certain deed of trust, which was satisfied of record, though no part of the note

which it secured was paid. The action is prosecuted by the public administrator of Lincoln county, in charge of the estate of one Wesley Upson, deceased, the *cestui que trust* in the deed of trust, against the grantors therein, viz., Orville Upson and wife. The grounds for the relief asked are mental incapacity of the deceased, undue influence, and want of consideration. The court below found the issues in favor of defendants, dismissing plaintiff's bill, and the case is here upon plaintiff's appeal.

Wesley Upson resided for many years in Lincoln county, where he owned certain lands and other property. He never married, and died in 1910, being about eighty years of age. He left surviving him two brothers, Beverly Upson and Wilbur Upson. Another brother, Albert, died in 1905. Beverly and Wilbur had homes of their own in the same community, but it appears that Wesley and Albert, the latter being also unmarried, lived together for many years prior to Albert's death. Prior to 1907 Wesley Upson owned and cultivated a farm of approximately one hundred eighty-five acres upon which he lived, and it appears that he owned another forty-acre tract of land, as well as some personalty. At the time of the death of Albert Upson, defendant Orville Upson, a nephew of Wesley Upson, and then unmarried, was employed by his uncle Wesley, and worked upon the latter's farm. Not long after the death of Albert Upson, Orville leased the farm and took entire charge of it. Orville married, and the uncle lived with him and his wife.

On February 14, 1907, Wesley Upson deeded the farm to Orville for the express consideration of $4000, Orville and his wife executing a deed of trust thereon to secure their note to Wesley Upson for $4000, bearing five per cent interest, and due fifteen years after date. On the same day Wesley Upson entered into an agreement with Orville and the latter's wife, which recites that ''in consideration of the relationship existing

between the parties and also for the gifts and sale of personal property, also for the sale of 185.54 acres of land of said Wesley Upson to said Orville Upson at a low price," Orville and his wife agree to "board, feed and care in all kindness for said Wesley Upson, as a member of their family in health and sickness, provide him a comfortable room and good furniture in house on the land this day sold to said Orville C. Upson," and that Wesley Upson agrees to remain with Orville and his wife, "as a member of their family on said farm during his natural life."

On October 31, 1908, nearly two years before his death, Wesley Upson acknowledged satisfaction of the deed of trust, on the margin of the record thereof, and cancelled the note which it secured; no part of the note having been paid.

It is unnecessary to set out in detail the testimony of the various witnesses, and to do so would serve only to extend the opinion beyond reasonable bounds. On behalf of plaintiff there is the testimony of a number of witnesses touching the matter of the mental capacity of the deceased about and for some time prior to the satisfaction of the deed of trust. Some of this is to the effect that the deceased had become forgetful and failed at times to recognize his friends or acquaintances. And it is said that after the death of his brother Albert, in 1905, a change came over Wesley Upson; that while he had been theretofore of a jovial disposition, he became somewhat morose and had but little to say to those about him.

Beverly Upson, at whose instance these proceedings are said to have been instituted, testified that at and about the time here in question his brother Wesley's mind was "almost blank;" that Wesley began to fail soon after Albert's death, and that by February, 1907 he was not, in the opinion of the witness, competent to transact business. It developed, however, that the witness had borrowed $1400 from his brother Wes-

ley, and that the latter afterwards forgave the debt, and cancelled the note and returned it to him. This, from the testimony, appears to have been some time between the execution of the deed of trust in question and its satisfaction of record. And it also appears that, shortly after the time of this gift, Wesley Upson deeded to his other brother, Wilbur, the forty acres of land above mentioned, as a gift. The witness thought that his deceased brother was in possession of his mental faculties when these gifts were made, but that he was utterly incompetent to transact business when the satisfaction of the deed of trust was entered.

Other testimony adduced to show that deceased was not capable of transacting business, at or about the time here in question, is by way of opinions of witnesses, with no showing of substantial facts upon which to base such opinions. One witness for plaintiff testified that, though the deceased was forgetful, he would seem to know and realize what he was talking about. Another said: ''He had a very good mind as far as I could tell.'' Another stated that the condition of his mind was ''all right'' as far as she knew. Others declined to express any opinion on the subject. One witness for plaintiff, a bank cashier, who had the opportunity to observe the deceased, saw nothing to indicate that he was not capable of transacting business.

On behalf of defendants, there was the testimony of a number of witnesses who had come in contact with the deceased at various intervals during the later part of his life. Their testimony tends to show that he was of sound mind and capable of transacting business, at and about the time with which we are here concerned, and that, in the main at least, he retained possession of his mental faculties until his death; that he kept informed upon political questions and discussed business affairs, and that though he became feeble of body his mind remained active and vigorous for one of his years.

It appears that after February 14, 1907, the deceased told others that he had turned the entire place over to Orville, to whom he referred those having any business pertaining to the farm. There is no suggestion that he ever had cause to be dissatisfied with the arrangement which he made with his nephew; and the irresistible inference is quite to the contrary. The evidence pertaining to the release of the deed of trust shows little more than that Wesley Upson personally took the papers to the recorder's office and satisfied the deed of trust of record and cancelled the note; though it does appear from the testimony of Beverly Upson that the deceased knew at the time that he held such a deed of trust executed by Orville and the latter's wife.

The evidence adduced, in our judgment, fully justifies the finding of the trial court on the issue of mental capacity. It is urged that one may have the mental capacity to make a will, and yet not be able to execute a deed. This is ordinarily true, i. e., presumptively, at least, a higher degree of mentality is required to execute a deed than to make a will; but since the satisfaction of the deed of trust was evidently intended as a gift to Orville Upson of the sum mentioned in and secured thereby, the reason for the above-mentioned distinction is of no particular importance in the case. [Jones v. Thomas, 218 Mo. l. c. 538, 539, 117 S. W. 1177.] And whether such distinction be here drawn or otherwise, the evidence is here of such character as to justify the conclusion that the deceased well knew what he was about when he performed the act in question. There is some evidence of a change in Wesley Upson after the death of his brother Albert, with whom he had been intimately associated for many years, but there appears to be little, if any, evidence, of probative value, tending to show that his mind became weakened and impaired after his brother's death. That he showed signs of grief over the loss of his

brother is no evidence of any impairment of his mental faculties.

We think that the preponderance of the evidence is in defendants' favor on the issue of mental capacity. At any rate it is quite clear that we should not disturb the finding of the trial court on this issue.

It is insisted by appellant that the facts disclosed in evidence conclusively show that a confidential relation existed between defendant Orville Upson and his uncle at the time of the satisfaction of the deed of trust in question. If this be true, it follows, as appellant contends, that the burden was thereby cast upon the defendants to show that the satisfaction of the deed of trust was not the result of undue influence and that no advantage was taken of the uncle in and about the transaction in question. This doctrine is firmly established in our jurisdiction, as will appear by reference to a few of the many cases which might be cited in support thereof. [See Turner v. Butler, 253 Mo. 202, 161 S. W. 745; Wendling v. Bowden, 252 Mo. 647, 161 S. W. 774; Cornet v. Cornet, 248 Mo. 184, 154 S. W. 121; Jones v. Thomas, supra.] But whether or not such a confidential relation was shown to exist between Orville Upson and his uncle as to cast upon the defendants the burden of proving that the satisfaction of the deed of trust was not the product of undue influence, it is unnecessary to say. If such be true, we think that defendants have met and carried that burden by a satisfactory showing that the transaction was had under circumstances which can justly excite no suspicion, and by the evidence adduced indicating that Wesley Upson knew and comprehended what he was doing in the premises, and that it was purely a voluntary act on his part, consistent with his evident plan to dispose of practically everything that he had in his lifetime rather than to have it pass by will or descent after his death.

It appears that more than three years before his death Wesley Upson began to give away his property to his relatives. To his nephew Orville he deeded the farm upon which he lived, arranging to be cared for during the remainder of his life. He retained a small annuity to be derived from the deed of trust, and had also a pension. Thereafter he gave to one brother forty acres of land, and to another he made a present of $1400. Later, in 1908, he released the deed of trust, thereby giving the farm outright to Orville. The record is barren of any evidence tending either directly or inferentially to show that Orville had or attempted to exercise any influence or control over his uncle in the premises. And the attendant circumstances appearing in evidence tend with no inconsiderable force to show that it was the intention and desire of Wesley Upson to dispose of his property in the manner in which he did dispose of it, as it was his privilege to do. And under the circumstances, the fact that there was no valuable consideration for the satisfaction of the deed of trust affords no ground for a court of equity to cancel the same.

Upon the issues of fact in a suit in equity, the appellate court will defer largely to the findings of the chancellor below, who had the witnesses before him. Irrespective of this, however, the evidence disclosed by this record convinces us that this judgment should be affirmed. It is so ordered. *Reynolds, P. J.,* and *Nortoni, J.,* concur.