JOHN M. MITCHELL, HARRY F. MITCHELL and HUBERT MITCHELL v. THOMAS FRANK MITCHELL, MAUDE E. BOHNENKAMP, MAUDE E. BOHNENKAMP, Trustee, LULA MAE MITCHELL, MAUDE E. BOHNENKAMP, Executrix, and LOUIS M. BOHNENKAMP, Appellants.— 41 S. W. (2d) 792.

Division One, September 5, 1931.

794

Watts & *Gentry* and *Elmer E. Hall* for appellants.

*James H. Hull, R. H. Musser* and *Ardey Gabbert* for respondents.

798

GANTT, P. J.—This case came to me on reassignment. Action to contest the validity of a writing as the will of Jenny C. Mitchell. It was admitted to probate in the Probate Court of Platte County.

The jury returned a verdict that the writing produced was not her will. Judgment accordingly, and proponents appealed.

It was alleged that she was of unsound mind at the time of the execution of the writing; that the writing was the result of the undue influence of proponents and that her signature thereto was procured by misrepresenting its contents. The answer, after admitting all formal allegations of the petition and specifically denying unsoundness of mind, undue influence and fraud, denied each and every allegation of the petition. Further answering, it was alleged that the writing was duly and legally executed; that she was of sound mind at the time of its execution and that it was her last will.

At the close of all the evidence the court instructed the jury to find that she was of sound mind at the time of the execution of the writing. The issues of undue influence and fraud were submitted to the jury.

I. Proponents contend there was no substantial evidence of undue influence and therefore no question for the jury on that issue.

There was evidence tending to show the following:

On May 23, 1922, Thomas F. Mitchell died testate in the town of Weston, Platte County. He left surviving him Jenny C., his widow 72 years of age, and sons, grandson and daughter as follows: John of Weston (carpenter and painter), Harry of Platte County (farmer), Thomas Frank of St. Louis (train baggageman on Missouri Pacific between St. Louis and Kansas City), Hubert, a grandson, and a daughter Maude, wife of Wm. L. Bohnenkamp, an attorney of St. Louis. To the daughter, grandson and each son he gave one dollar, and to the widow all of his real and personal property.

After the funeral and on May 29, 1922, at a conference in Weston attended by the widow, Mr. and Mrs. Bohnenkamp and Thomas Frank, the widow was advised by Mr. Bohnenkamp that if she died before making a will Harry's interest in her estate would be taken by his creditors. He further advised that she should make a deed conveying all the real estate to one of her children, other than Harry, to circumvent said creditors. It was agreed this should be done. Thereupon Mr. Bohnenkamp prepared a deed conveying all the real estate to his wife. The widow was taken to a notary public by Mrs. Bohnenkamp and the deed executed and delivered to her without consideration. It was not recorded. The other sons and the grandson did not know of the deed until it was produced at the trial by proponents.

After the funeral Mrs. Bohnenkamp remained with the widow at Weston for ten days. At the end of that time the widow visited with the Bohnenkamps in St. Louis for two months, after which she returned to Weston. Thereafter Mr. Bohnenkamp prepared a will

which was executed by the widow on August 3, 1922, in Weston. The widow delivered the will to Mrs. Bohnenkamp, who delivered it to Mr. Bohnenkamp. The will provided as follows:

It gave to Mrs. Bohnenkamp $2,000 in trust for Hubert, the grandson, until he was 25 years of age, at which time she was directed to deliver the fund to him. However, if Hubert died before that time, the fund was given to Mrs. Bohnenkamp.

It also gave to Mrs. Bohnenkamp one-fourth of the residue of the estate in trust for John, with directions to pay to him the income, and at his death to pay the principal to his children.

It also gave to Mrs. Bohnenkamp one-fourth of the residue of the estate in trust for Thomas Frank, who had no children (but had step-children), with directions to pay to him the income during his life and at his death the fund was given to Mrs. Bohnenkamp.

It also gave to Mrs. Bohnenkamp one-fourth of the residue of the estate in trust for Harry, with directions to pay to him the income, and at his death to pay the principal to his children.

It also gave to Mrs. Bohnenkamp one-fourth of the residue of the estate absolutely.

It provided that if a son died and left a minor child, the share of such child was given to Mrs. Bohnenkamp in trust until the child was 25 years of age. If Mrs. Bohnenkamp died, Mr. Bohnenkamp was named trustee of the trust funds, and Mr. and Mrs. Bohnenkamp were named executor and executrix of the will with a request for no bond.

A codicil was prepared by Mr. Bohnenkamp in St. Louis and executed by the widow on August 17, 1923, in Weston. In the codicil it was stated that John used eighty acres of the land for some years during the life of his father, on which he paid no rent, and also resided in his father's house in Weston for some time during the life of his father and since, on which he paid no rent; and that Harry owed his father's estate a note for $2500, which was unpaid; and that to equalize the distribution of her estate she gave Mrs. Bohnenkamp $2500, and gave her $2500 in trust for Thomas Frank under the terms set forth in the will; that is, on the death of Thomas Frank she gave the fund to Mrs. Bohnenkamp.

After Maude married Mr. Bohnenkamp, her father and mother made frequent and lengthy visits to them in St. Louis. On one of these visits Mr. Mitchell delivered to Mr. Bohnenkamp $1500, to be loaned for him. Mr. Bohnenkamp suggested that a good security be purchased instead of a loan. Mr. Mitchell preferred to loan the money to Mr. Bohnenkamp, who gave him a note. The money was invested by Mr. Bohnenkamp and the interest paid semi-annually to Mr. Mitchell. After his death, payments of interest on the note were twice made to Mrs. Mitchell. The Mitchells paid no board

while visiting the Bohnenkamps. After Mr. Mitchell's death, Mrs. Mitchell lived with the Bohnenkamps for two years during the winter months, for which she paid no board. The note was paid by charging to Mr. and Mrs. Mitchell $800 for board during the time they lived with the Bohnenkamps, and charging to them $700 for legal services rendered by Mr. Bohnenkamp to Mr. and Mrs. Mitchell, and to Harry in his bankruptcy proceeding.

On August 9, 1922, Mr. Bohnenkamp cashed the widow's check on the Weston bank for $4,000 payable to him. This was insurance money on the life of her husband. On August 11, 1922, $1,000 or more was drawn from the Weston bank on the check of Mrs. Mitchell. On September 14, 1922, the Weston bank shipped by express to Thomas Frank Mitchell at Kansas City $1200 in Liberty bonds belonging to the widow. On August 24, 1924, the widow transferred her bank account to Mrs. Bohnenkamp and Thomas Frank, or the survivor. Thereafter only Thomas Frank could sign checks drawn on the widow's bank account. And between trips as baggageman on the railroad, he went from Kansas City to Weston to attend to the widow's business affairs, including business with Harry and John as her tenants. After the execution of the will and codicil, the $5,000 and the $1200 in bonds belonging to the widow and in the possession of proponents were divided between Mrs. Bohnenkamp and Thomas Frank, with the knowledge of the widow. In the meantime Harry had been adjudged a bankrupt and released from indebtedness. In view of this and the gift of $3100 each to Mrs. Bohnenkamp and Thomas Frank, the will under consideration was prepared. It was written by Mr. Bohnenkamp in St. Louis and delivered for execution on January 23, 1925, by Thomas Frank to the widow at the home of John in Weston. On that day she executed the will, and Thomas Frank delivered it to the Bohnenkamps in St. Louis.

The distribution was preceded by introductory paragraphs which follow:

"I, Jenny C. Mitchell, a resident of Weston, Platte County, Missouri, being of sound and disposing mind and memory, recognizing the uncertainty of life, do hereby make and publish this, my last will and testament, hereby revoking all former wills and codicils by me made. Before disposing of my estate I want to set the following statement:

"Whereas, my son, John M. Mitchell, has had the use and occupation of eighty acres of land for some years during the life of his father, and since his father's death, on which he has paid no rent and also resided in the house in Weston, during the life of his father, and since his father's death, on which he has paid no rent, but for which he has received benefits of at least two thousand five hundred ($2500) dollars;

"And whereas, my son, Harry Mitchell, executed to his father a note in the sum of two thousand five hundred ($2500) dollars, which said note was assigned to me in the settlement of my husband's estate, and which note I have returned to him, although he did not pay the same;

"And, whereas, I have during my lifetime given to my daughter, Maude E. Bohnenkamp, and my son, Thomas Frank Mitchell, each, the sum of two thousand five hundred ($2500) dollars, for the purpose of equalizing them with my said sons, John and Harry Mitchell —thus having advanced to each of my four living children the sum of two thousand, five hundred ($2500) dollars, either in the form of benefits, cash or securities;

"And whereas, I have during my lifetime further given my daughter, Maude E. Bohnenkamp, and my son, Thomas Frank Mitchell, each, the sum of six hundred ($600) dollars in Liberty bonds for the purpose of partially equalizing them with my said sons, John and Harry Mitchell, for benefits and advantages (other than the two thousand five hundred ($2500) above mentioned) they received, in that they had the benefit and use of the farm and houses to live in, at a low rate of rental and in that said sons, John and Harry, have received other advantages and benefits at the hands of their father and mother, that naturally flow from parents to children who are in need and who live near their parents, as said sons, John and Harry, did all their life, said daughter, Maude, and son, Thomas Frank, have never received any such aid at the hands of their parents; and

"Whereas, I was indebted to my daughter, Maude, and her husband, William L. Bohnenkamp, for board and legal services in the sum of one thousand, five hundred ($1500) dollars; and

"Whereas, I held a note in the sum of one thousand, five hundred ($1500) dollars, executed by my daughter and her husband, William L. Bohnenkamp, on which they have paid all the interest regularly, and have turned over and delivered said note to Maude and William L. Bohnenkamp in satisfaction of said indebtedness;

"Now, therefore, I desire to dispose of the estate which I yet have and which is practically real estate as follows:"

In this will the bequest to Hubert was not given to Mrs. Bohnenkamp in the event he died before he was twenty-five years of age; John's one-fourth of the residue was given to him absolutely; Harry was given one-eighth of the residue absolutely; and Mrs. Bohnenkamp was given one-eighth of the residue in trust for Lula Mae, the daughter of Harry, until she was thirty years of age; and the provision in the codicil making special bequests to Mrs. Bohnenkamp and Thomas Frank was omitted for reasons stated in the introductory paragraphs to this will. Otherwise, the distributions made in the wills are identical.

As stated, these special bequests and later in lieu thereof the gifts mentioned in the introductory paragraphs to this will were on the theory of equalizing Mrs. Bohnenkamp and Thomas Frank with John, who it was claimed owed his father $2500 for rent, and with Harry, whose note for $2500 payable to his father was owned by the widow.

John was not indebted to his mother, had not used land belonging to his father for twenty-one years, had an agreement with his father to pay crop rent, paid said rent and was not indebted to him. The inventory of his father's estate did not include a charge against John for rent and no effort was made by the widow to collect from him for such indebtedness.

Harry borrowed $2500 from his father with which he purchased land. The land depreciated in value and he was unable to pay the debt. The trustee in bankruptcy of Harry's estate paid to Thomas Frank $950 on Harry's indebtedness. It does not appear that this sum was credited on the $2500 note or on other indebtedness.

Hubert, the grandson, was given only $2,000 on the theory that he inherited property from his father, Hugh Mitchell, and would inherit from his mother the $5,000 life insurance paid to her on the death of his father, and would thereby receive his share of the Mitchell property. The father of Hubert received no property or money from either his father or mother.

The gift to Mrs. Bohnenkamp in trust for Thomas Frank was an effort to prevent his wife from receiving property which came from the Mitchell estates. However, Thomas Frank was at the time owner of property of the value of $16,000.

The widow was an invalid for many years. She was afflicted with asthma, heart trouble, crippled limb and walked with a cane. During the life of her husband she attended to no business. Her farm in Platte County was rented to Harry, and the house in Weston was rented to John. She lived with John during the summer, paying $40 per month for board. Of this, $15 per month was paid by rental due from John, and $25 in cash. She made short visits to the farm and reported to proponents by letters in which she charged Harry with mismanagement and the appropriation of her property. Thereupon proponents wrote letters to Harry charging him with unlawful conduct. There was no foundation for the charges. These letters and others tend to show that she leaned upon proponents as the custodians and managers of her property.

We think this is substantial evidence tending to show that the execution of the will was the result of undue influence on the part of proponents. It would be unusual for an aged widow to call a

804

son, son-in-law and daughter in conference to consider the financial affairs of another son so soon after the death of her husband. On the contrary, the evidence tends to show that proponents anchored to the financial difficulties of Harry as an excuse for urging the widow to convey all of her real estate to Mrs. Bohnenkamp. After the conveyance of the real estate, the possession of the personal property was rapidly transferred to proponents. Thereafter proponents were in complete control by the management of all her business affairs. From this the jury could find that a fiduciary relation existed, from which followed a presumption of undue influence. Furthermore, and independent of the presumption, there was evidence tending to show undue influence. It should be noted that the record does not present the question of a preference as the result of natural affection, kindness, association and occasional attention to business of a testator or testatrix. It is a question of the widow equalizing her sons, grandson and daughter in the distribution of her property. The evidence, including the wills, indicates that a mathematical effort was made to do so. We think it could be inferred from the evidence above set forth that it was proponents and not the widow who originated the reasons above mentioned for the discrimination in favor of proponents.

On this question proponents cite cases as follows: Bushman v. Barlow, 316 Mo. 916, 292 S. W. 1039; Turner v. Butler, 253 Mo. 202, 161 S. W. 745; Hamlett v. McMillin, 223 S. W. 1069; Mayes v. Mayes, 235 S. W. 100; Van Raalte v. Graff, 253 S. W. 220; Huffnagle v. Pauley, 219 S. W. 373; Gibony v. Foster, 230 Mo. 106, 130 S. W. 314; Kuehn v. Ritter, 233 S. W. 5; Pinson v. Jones, 221 S. W. 80. The facts in these cases are different and they are not in point.

Proponents also contend there was no substantial evidence that the signature of the widow to the will was procured by misrepresenting its contents.

There was evidence tending to show that Mr. Bohnenkamp delivered the will to Thomas Frank in St. Louis to be taken by him to Weston and delivered to the widow for execution; that he (Thomas Frank) went to Weston and did so; that on delivering the will he informed the widow that the will distributed the property equally among the sons, grandson and daughter; that she did not read the will and it was not read to her; that she executed the will and delivered it to Thomas Frank, who delivered it to the Bohnenkamps in St. Louis.

In this connection there was evidence tending to show that some months after the execution of the will the widow read it while visit-

ing the Bohnenkamps in St. Louis and stated that "it was what she wanted." This tends to show that she understood the will at the time she executed it and that Thomas Frank did not deceive her as to its contents. There is also other evidence tending to show that she read the will before signing it and that Thomas Frank did not deceive her as to its contents. It follows, the question was for the jury and the contention is overruled.

II. Proponents challenge an instruction given at the request of contestants which follows:

"The court instructs the jury that the burden rests upon the defendants in this case to show by the greater weight of the evidence that the paper writing described in the petition and read in evidence was signed by the testatrix, Jennie C. Mitchell, and that at the time of signing the same she declared the same to be her last will and testament in the presence of the witnesses, Charles D. Hall, Jr., and Howard Dale, and that at her request the said witnesses signed said instrument as witnesses thereto in her presence, and at the request of said testatrix, and that at the time of signing the same, said testatrix was of sound and disposing mind and memory, and that if the defendants have not so established the execution of said will to the satisfaction of your minds, your verdict must be for plaintiffs, and in this connection, you are instructed that you must find, from the evidence, that Jennie C. Mitchell, deceased, was at the time she signed said paper writing, of sound mind."

It will be noted that the instruction places the burden on proponents to show, among other things, that the widow was of sound mind at the time the will was executed, and thereafter directed the jury that they must find she was of sound mind at said time.

They argue that the conflict tended to confuse the jury and was prejudicial. We do not think so. The last part of the instruction relieved the proponents of said burden. We think the jury so understood the instruction.

III. Proponents also challenge an instruction given at the request of contestants, which follows:

"The court instructs the jury that if the jury find and believe from the evidence in this case that the relation of trust and confidence existed between Thomas Frank Mitchell and Maude E. Bohnenkamp, the defendants, or either of them, and their mother, Jennie C. Mitchell, the purported testatrix, at the time of the execution or signing by said Jennie C. Mitchell of the paper writing propounded as her will in this case, this fact taken in connection with the interest they took thereunder shifted the burden of proof upon them to show by a pre-

ponderance of the evidence that she not only read said document, but understood its provisions, and what disposition she was making of her property, and that she acted freely from her own volition, and that the execution of said purported will was not the result of fraud or undue influence perpetrated upon her by them, or either of them.''

They argue that the instruction was erroneous for reasons as follows:

(a) That there was no substantial evidence tending to show the existence of a fiduciary relation. We have ruled this against proponents.

(b) That the fraud charged in the petition was independent of undue influence, and therefore the burden on that issue was upon contestants. The evidence does not sustain the contention, and in the petition it was charged ''that said alleged testatrix never knew the contents thereof, or what she was signing; that the same was brought to Platte County, Missouri, by said Thomas Frank Mitchell, her trusted agent, who then had, held and wielded an undue influence over her mind and who occupied a fiduciary relation to her and her property, and by the use by him of his undue influence over her and over her mind and by the abuse of his said fiduciary relation to her in so doing, he caused her to sign said pretended will.'' Thus it appears that the fraud was charged to undue influence and there was sustaining evidence. We think the burden on that issue was upon the proponents.

(c) That Mrs. Bohnenkamp did not practice a fraud which brought about the execution of the will, and for that reason the jury should not have been instructed that the burden was upon them to disprove fraud. This also proceeds on the theory that the fraud charged was independent of undue influence. If the jury found that a fiduciary relation existed, we think the burden was upon proponents.

(d) That the subjects of fraud and undue influence were confused in the instruction. Proponents point out no confusion, and we discover none.

IV. Proponents contend that the court was in error in excluding certain evidence. The contestants, or some of them, testified at the trial that the widow was of unsound mind. They had given their depositions in which they testified that she was of sound mind. Proponents offered to show that the change in their testimony was the result of a conference with their attorneys. On objection of contestants, the testimony was excluded. It will not be necessary to rule the question for the reason the court directed the jury to find that the widow was of sound mind.

V. Proponents contend that on their objection the court should have reprimanded counsel for arguing to the jury that Mrs. Bohnenkamp was a rich woman. The argument was improper, but we do not think it was prejudicial. It appeared in evidence that the only property owned by Mrs. Bohnenkamp was the property she received from her mother. Therefore, the jury knew her financial condition.

Other assignments of error on the giving of instructions are either without merit or have been ruled against proponents. It follows the judgment should be affirmed. It is so ordered. All concur.