WILLIAM BALAK et al., Respondents, v. JOSEPH
SUSANKA, Appellant.

**St. Louis Court of Appeals, April 7, 1914.**

1. **WILLS: Contest: Issues and Burden of Proof.** Under Section
555, R. S. 1909, the issue to be submitted to the jury, in a will
contest, is whether the writing produced be the will of the
testator or not; and the burden is on the proponent to esab-
lish, not only due execution of the will, but the mental capacity
of the testator.

2. ———: ———: ———. Ordinarily, the burden is upon the
plaintiff, in a will contest, to show undue influence over the
testator, but where plaintiff shows a state of facts establishing
a fiduciary relation, or some such similar confidential relation,
between the defendant, a principal beneficiary, and the testator,
the burden shifts, since it will be presumed, under such circum-
stances, that undue influence was used.

3. ———: ———: **Appellate Practice: Conclusiveness of Ver-
dict.** A will contest is an action at law, and hence the ap-
pellate court will not reverse a judgment in such a case on the
ground that the verdict appears to be against the weight of
the evidence, but will reverse it only where there is no sub-
stantial evidence in the record to support it.

4. ———: ———: **Testamentary Capacity: Evidence.** A per-
son may not have the mental capacity to transact business
and yet be competent to make a will, and personal eccentricities
and oddities are not alone evidence of such mental disorder
or deterioration as to render a person incompetent to make a
will.

5. ———: ———: ———: ———. In analyzing the evidence
in a will contest for the purpose of determining its sufficiency
to establish the mental capacity of the testator, it would be
unfair to contestant to pronounce judgment of insufficiency
upon each matter of evidence, but the whole of the evidence
should be considered connectedly.

6. ———: ———: ———. In order for a testator to under-
stand the natural objects of his bounty and their deserts with
reference to their conduct and treatment of him, he must
necessarily be able to contemplate them with a mental vision
free from and unaffected by the delusions or false beliefs of a
disordered mind.

7. ———: ———: ———: Evidence: Question for Jury. While the fact of the testamentary capacity of the testator is to be decided by the condition of his mind at the time the will· is made, yet evidence of prior and subsequent occurrences, tending to shed light upon the question of such capacity at the time the will was executed, is admissible. It is not necessary, in order to overturn the will, that there be direct and positive proof of testamentary incapacity at the very time the will was executed, but proof of insanity or permanent mental incapacity, and especially where progressive, raises a presumption of the continued existence thereof, which it is incumbent upon the proponent to rebut in order to establish the nonexistence thereof at the precise time the will was executed; and substantial evidence of mental incapacity of such character, together with evidence of the proponent to the contrary, should generally be sent to the jury, in order that they may resolve the conflict.

8. ———: ———: ———: Sufficiency of Evidence. In a will contest, the question of the testamentary capacity of the testator *held*, under the evidence, to be one for the jury. *Held*, by REYNOLDS, P. J., dissenting, that there was no substantial evidence tending to prove a lack of testamentary capacity of the testator.

9. ———: ———: Undue Influence: What Constitutes: Evidence. The character of undue influence necessary to be shown to overturn a will is such influence as amounts to over-persuasion, coercion, fraud or force, substituting the will of another for that of the testator; but it is not necessary that the existence and exercise of undue influence be shown by direct and positive evidence, but is sufficient if the same may be inferred from facts and circumstances in evidence.

10. ———: ———: ———: Sufficiency of Evidence. In a will contest, the question as to whether the principal beneficiary exerted undue influence over the testator with respect to the making of the will *held*, under the evidence, to be one for the jury.
*Held*, by REYNOLDS, P. J., dissenting, that there was no evidence tending to prove that defendant had exerted any undue influence over testator.

11. ———: ———: ———: Instructions: Conformity to Pleadings. An averment in the petition, in a will contest, that the will was the product of undue influence exerted by defendant, was broad enough to include any such influence exercised by him, either directly, or through other persons, whom he may have utilized to that end, and hence an instruction charging the jury that they should find against the will if they believed from the evidence that defendant "or other person or persons

in his behalf" exerted undue influence over the testator, so that the will did not express her desire and disposition of her property, was not beyond the scope of the petition.

*Held*, by REYNOLDS, P. J., dissenting, that the petition charges that defendant himself exerted undue influence, and does not charge that anyone else exerted influence in his behalf; *held, further*, that there was no evidence tending to show that any other person or persons had exerted undue influence; and hence it is *held* that the instruction was erroneous.

**REYNOLDS, P. J., dissents.**

Appeal from St. Louis City Circuit Court.—*Hon. William B. Homer*, Judge.

AFFIRMED.

*Taylor R. Young* and *Willard H. Guest* for appellant.

(1) The test of a testator's competency to make a will is, that he understood the business about which he engaged when he had his will prepared and executed it, knew the persons who were the natural objects of his bounty and understood his relations to them and knew what property he had and the disposition he desired to make of it. Winn v. Grier, 217 Mo. 420; Weston v. Hanson, 212 Mo. 248; Archambault v. Blanchard, 198 Mo. 384; Sayre v. Trustees Princeton University, 192 Mo. 95; Story v. Story, 188 Mo. 110; Hamon v. Hamon, 180 Mo. 685; Crowson v. Crowson, 172 Mo. 691; Wood v. Carpenter, 166 Mo. 465; Riggin v. Westminster College, 160 Mo. 570; Sehr v. Lindemann, 153 Mo. 276; Riley v. Sherwood, 144 Mo. 355; DeVeld v. Judy, 143 Mo. 348; Cash v. Lust, 142 Mo. 630; McFadin v. Craton, 120 Mo. 253; Maddox v. Maddox, 114 Mo. 47; Couch v. Gentry, 113 Mo. 248; Jackson v. Hardin, 83 Mo. 175; Gibony v. Foster, 230 Mo. 132; Hayes v. Hayes, 242 Mo. 169; Luebbert v. Brockmeyer et al., 158 Mo. App. 210; Wolfe v. Whitworth, 170 Mo. App. 375. It requires evidence of

Balak v. Susanka.

some probative force that at the time of the execution of the will the testator was not of sound mind and disposing memory to overthrow his will. Von de Veld v. Judy, 143 Mo. 363. A man may be incapable of making a contract of managing his estate and yet be competent to make a will. Maddox v. Maddox, 114 Mo. 35; Crowson v. Crowson, 172 Mo. 702. If the testator, at the time of the execution of the will, has mental capacity to understand that he is engaged in making his will and knows the persons who are the natural objects of his bounty and his relation to them, and knows his property and the disposition he desires to make of it, no matter what eccentricities it may be proved he at other times exhibited, he has testamentary capacity. Winn v. Grier, 217 Mo. 420; Weston v. Hanson, 212 Mo. 248; Sehr v. Lindemann, 153 Mo. 276; Sayre v. Trustees Princeton University, 192 Mo. 95; Von de Veld v. Judy, 143 Mo. 348; Archambault v. Blanchard, 198 Mo. 384. (2) The burden is on the contestants of a will to show the incompetency of the testator and that undue influence was exerted to procure the execution of the will. The presumption of competency indulged in by the court together with evidence of the due execution of the will must be overcome by persuasive evidence. Sehr v. Lindemann, 153 Mo. 276; Riggin v. Westminster College, 160 Mo. 571. (3) Where the evidence is such that it is the duty of the trial court to set aside a verdict as unsupported by the evidence, it is the duty of the court to interfere before submission to the jury. Jackson v. Hardin, 83 Mo. 175; Weston v. Hanson, 212 Mo. 248; Archambault v. Blanchard, 198 Mo. 384; McFadin v. Catron, 120 Mo. 252, 128 Mo. 213; Maddox v. Maddox, 114 Mo. 35; Cash v. Lust, 143 Mo. 630; Story v. Story, 188 Mo. 110; Winn v. Grier, 217 Mo. 420; Von de Veld v. Judy, 143 Mo. 348. (4) The influence exerted upon a testator which is sufficient to invalidate his will must be such as amounts to over persuasion, coercion or

force, destroying the free agency of the testator, and not merely the influence of affection or attachment or the desire of gratifying the wishes of one beloved, respected and trusted by the testator. Conner v. Skaggs, 213 Mo. 334; Weston v. Hanson, 212 Mo. 248; Teckenbrock v. McLaughlin, 209 Mo. 533; Seibert v. Hatcher, 205 Mo. 101; Cowan v. Sharer, 197 Mo. 203; Campbell v. Carlisle, 162 Mo. 634; Riggin v. Westminster College, 160 Mo. 570; Martin v. Bowdern, 158 Mo. 379; Schierbaum v. Schemme, 157 Mo. 1; Sehr v. Lindemann, 153 Mo. 277; Maddox v. Maddox, 114 Mo. 35; DeFoe v. DeFoe, 144 Mo. 545; Cash v. Lust, 142 Mo. 630; Jackson v. Hardin, 85 Mo. 175; Turner v. Anderson, 236 Mo. 541; Luebbert v. Brockmeyer at al., 158 Mo. App. 208. Undue influence must not only be shown to exist, but in order to overthrow the will it must be shown by affirmative proof to have been actually exerted at the time the will was executed. Tibbe v. Kamp, 154 Mo. 545; McFadin v. Catron, 120 Mo. 573. Partiality and inequality of gifts by the testator to one child or children are not sufficient grounds for setting aside a will, even though the testator gives nearly all of his estate to one child. McFadin v. Catron, 138 Mo. 197. (5) Instruction number 3 given for the plaintiffs is erroneous in that it undertakes to enlarge the issues made by the pleadings, by putting before the jury the issue of whether those about the testatrix or any one in behalf of the defendant exercised any influence over the testator to procure the will in question, whereas the petition charges the will to have been the result of the undue influence of the defendant. Wallack v. St. Louis Transit Company, 123 Mo. App. 160; State ex rel. Schreiber v. Dieckman, 124 Mo. App. 653; Feddeck v. St. Louis Car Co., 125 Mo. App. 24.

*O. W. Hammer* and *Earl M. Pirkey* for respondents.

(1) The following definition of testamentary competency has been adopted in Missouri, to-wit: ''The standard of mental capacity required to sustain a will has been fixed so far as judicial utterances can settle a principle, and it is that the testator must have 'had sufficient understanding to comprehend the nature of the transaction that he was engaged in, the nature and extent of his property, and to whom he desired to give it, and was giving it, without the aid of any other person.' '' Mowry and Kettering v. Norman, 223 Mo. 474; Holton v. Cochran, 208 Mo. 423. The disposal by a testator of his property to other than his children is some evidence of mental unsoundness. Bensberg v. Washington University, 158 S. W. 334. A change from habits of cleanliness to the opposite is evidence of mental unsoundness. Knapp v. Trust Company, 199 Mo. 665. (2) The assignment that the verdict is against the weight of the evidence is an admission that there is sufficient evidence to support the verdict. Crawford v. Stockyards Co., 215 Mo. 402. (3) Where the answer does not specifically or generally deny every allegation of the petition, but contains a denial ''of each and every allegation in said petition contained and not hereinbefore expressly admitted,'' then such an answer does not have the effect of traversing any of the statements of the petition and the only issues arising upon it are those which are joined by the reply, denying its affirmative defenses. Harding v. Railroad, 248 Mo. 669. (4) Upon the question of mental capacity the burden is upon the defendants or proponents of the will throughout and never changes or shifts. Mowry and Kettering v. Norman, 204 Mo. 189. (5) The fact that a devisee was managing the business of the testator for a year before making the will constituted a fiduciary relation so as to shift the burden of

proof upon him to negative undue influence. Byrne
v. Byrne, 157 S. W. 612; Mowry and Kettering v. Nor-
man, 204 Mo. 189. It is some proof ·of undue influ-
uence that the devisee accompanied the testator to the
place where the will was and made suggestions to the
party who drew the will. Luebbert v. Brockmeyer, 158
Mo. App. 211. The unequal distribution of property
made by a will is a circumstance to consider on the
question of undue influence. Byrne v. Byrne, 157 S.
W. 609. (6) If testimony is received without objection,
it is proper to instruct on it, although it is beyond the
averments of the petition. Nelson v. Railways Co., 158
S. W. 446; Mellor v. Railroad, 105 Mo. 455; Litton v.
Railroad, 111 Mo. App. 140; R. S. Mo. 1909, Sec. 1847.
(7) The motion for a new trial must so definitely set
out the reasons therefor as to direct the attention of the
trial court to the precise error of which complaint is
made. Aultman and Taylor Machine Co. v. Organ, 149
Mo. App. 102; State v. Gaultney, 242 Mo. 391. (8) Any
witness's credibility may be attacked by introducing
testimony tending to show that his reputation for gen-
eral moral character is bad. State v. Priest, 215 Mo.
7; State v. Shields, 13 Mo. 236; Sitton v. Grand Lodge,
84 Mo. App. 211; York v. Everton, 121 Mo. App. 646;
Blue v. Kirby, 15 Am. Dec. 95; Tacket v. May, 3 Dana,
79. (9) It is necessary that there be some declara-
tion by·testator that the paper was his will and the
acknowledgment made by him to the witness that he
desires him to attest it as such. Grimm v. Tittman, 113
Mo. 56; Cravens v. Faulconer, 28 Mo. 21.

ALLEN, J.—This is a proceeding instituted by
William Balak, John Balak and Mary Rose, to con-
test the validity of an instrument purporting to be
the last will and testament of their mother, Josefa
Balak, deceased, and which had been duly probated as
such. From a verdict and judgment in favor of plain-

tiffs, the defendant, Joseph Susanka, a brother of the deceased, appeals.

The amended petition upon which the case was tried, alleges that the deceased, Mrs. Balak, lacked testamentary capacity to make a will, at the time of the execution of the instrument in question, and that the latter was the product of undue influence on the part of the defendant, the sole beneficiary thereunder.

The answer, after admitting certain formal allegations of the petition, avers the due execution of the instrument as the last will and testament of said Josefa Balak; that the estate was valued at the sum of $1100; and that the said Josefa Balak was of sound and disposing mind and memory. It then denies generally the allegations of the petition "not specifically admitted" by the answer; and avers that Josefa Balak had, prior to her death, given plaintiffs each the sum of $5000; that she was not on friendly terms with her children for the reason that William Balak had threatened to put her in the penitentiary, that John Balak had ordered her from under his roof because of her refusal to give him all of her money, and that her daughter, Mary Rose, had failed and refused to answer her letters during the last years of her life; and that deceased was dependent entirely upon defendant, her brother, to look after her in her declining years.

The instrument, purporting to be Mrs. Balak's will, directed the payment of her debts and funeral expenses, directing that not less than two hundred dollars be expended for her burial. All of the remainder of her property was bequeathed to her brother, Joseph Susanka, the defendant herein; this clause of the will stating that deceased's said brother had alone befriended her and looked after her welfare in her declining years, and that she intentionally omitted her children, these plaintiffs, as she had given them more

than their share of her estate during her life. The defendant was named executor without bond.

It appears that the parents of these plaintiffs, Mr. and Mrs. Balak, lived in the city of St. Louis in their early life, the father being a tailor; that later they moved with their family to Macoupin County, Illinois, where the father purchased certain land. They seem to have accumulated some property derived from the joint earnings of all of the family, including these plaintiffs. Prior to the death of plaintiffs' father, and it seems about 1885 or 1886, he made a distribution of the major portion of this property among his children, giving to William and John each an equity in a farm, and to the daughter Mary cash amounting to perhaps five thousand dollars, which it may be inferred was regarded as the approximate value of the equity in each of the farms given to the sons. It appears that he reserved to himself an annuity of two hundred dollars to be paid by each of the children, and that he had a pension. Thereafter the two sons, William and John, purchased a house in Carlinville, Illinois, for their parents to live in, where the latter made their home until the father's death in 1899 or 1900. After this the mother, Mrs. Balak, continued to live there, having some small means, a small pension, and some rent derived from renting out a portion of the house; and being furnished with supplies, at least to some considerable extent, by her children. Later, it seems in 1907 or 1908, she insisted that she wanted the house deeded to her, and it was conveyed to her by the sons for the consideration of eight hundred dollars. It seems that this was the amount which they had originally paid for it, but that considerable in the way of repairs and improvements had been put upon it by them, and that their mother had occupied it without paying rent. In the meantime William and John had removed to the city of St. Louis, where they now reside. The daughter, Mrs. Rose, had been away

for some thirty years prior to the trial below, she and her husband living at Atchison, Kansas, and in later years spending considerable time in Colorado and California. She testified that she had visited her mother as often as possible while the latter lived in Carlinville—at least once a year, and sometimes oftener.

Early in 1909 Mrs. Balak sold the house in Carlinville and came to St. Louis to live with her son John at his home. There is evidence that her brother, the defendant, was responsible for her coming; that defendant went to John and induced him to prepare a room in his home for his mother's use, and that he, in part at least, advised her as to the sale of her Carlinville house and her coming to St. Louis.

Mrs. Balak resided with her son John for about six weeks only. There is quite a conflict in the evidence relative to the reason for her leaving his home. He testified that she drank whiskey and gin in great quantities, at all hours of the day and night, and that the defendant, who came to see her almost daily, kept her supplied with large quantities of these liquors; that she was almost, if not, constantly under the influence of liquor, and that he remonstrated with the defendant, his uncle, for thus supplying her with intoxicating liquors; that he knew that his mother had been accustomed for years to take alcoholic stimulants, but not to such excess, and that he only objected to her excessive use thereof, because of the injurious effect it was having upon her. He testified that defendant told his mother what he had said; that she was much provoked over it, and that shortly thereafter defendant took her from his home and rented a room for her at 1601 Picker street in the city of St. Louis.

There is testimony to the effect that defendant told John that if he would take his mother to live with him she would turn over to him what money she had, consisting, it seems, principally of the proceeds of the sale of the Carlinville house; that after com-

ing to John's home she declined to do this unless she received security therefor, and that she left her son's house because of difficulty on this score. John denies this, however, and the testimony relative to the matter is quite conflicting.

After leaving her son's home Mrs. Balak lived for perhaps six months on Picker street. Being compelled to move from this place by the owner thereof, the defendant procured quarters for her elsewhere; and at the time of her death, to-wit, December 2, 1910, she was living in a room which had been rented for her by defendant on South Eleventh street. It appears from the record that her death was due to asphyxiation caused by gas escaping from an open valve of a gas stove.

The instrument here in question, purporting to be Mrs. Balak's last will and testament, was executed November 30, 1909. It was drawn by Anthony Klobasa, a notary public and insurance agent, and executed in his office, the attesting witnesses being called in by him to witness it. A former will had been prepared by Klobasa while the testatrix lived on Picker street, and he was summoned (it seems by defendant) to have such instrument executed, while the deceased was unable to leave her room. The contents of the former instrument do not appear. Upon the occasion when the will here in controversy was executed, Mrs. Balak came to Klobasa's office with the defendant, and the instrument was there prepared and executed. She was Bohemian by birth, and could not read or write English. On direct examination Klobasa, testifying as a witness for defendant, insisted that he received his sole instructions from deceased as to what was to go into the will, prepared it and read it to her in the Bohemian language, and that defendant took no part in the matter whatever. And he repeated, at frequent intervals, that he would not accept suggestions from any one except the person making a will. However,

on cross-examination, he testified that defendant and the deceased conversed at the time, in Bohemian, concerning the will; and upon being confronted with a deposition which he had previously given, he admitted that his testimony therein, to the effect that, at the time of the execution of the will, both defendant and deceased were talking to him and telling him what to put in the will, was correct. He then further testified: "They were both talking; of course they were both talking. . . . Well they were talking about making up their part of the will." "Q. And he (defendant) told you as well as she what to put in, didn't he? A. Well I suppose he did. They had to when they were talking there, as a matter of course."

The above statement of facts will serve to show the situation of the parties, and the circumstances, at least in a general way, surrounding the execution of the will. Other testimony relative to the issues of testamentary capacity and undue influence will be referred to more in detail in considering the sufficiency of the evidence to take these issues to the jury.

I. In a proceeding to contest the validity of a will, the issue to be submitted to the jury is "whether the writing produced be the will of the testator or not." [Sec. 555, Rev. Stat. 1909.] And the burden is upon the proponent of the will to establish, not only the due execution of the latter, but the mental capacity of the testator. [Bensberg v. Washington University, 251 Mo. l. c. 656, 158 S. W. 330; Bradford v. Blossom, 207 Mo. 177, 228, 105 S. W. 289, and cases cited. See also what is said as to this in Turner v. Butler, 253 Mo. 202, 161 S. W. l. c. 748.]

"Under ordinary circumstances the burden is upon the plaintiffs throughout to show undue influence. . . . However, if plaintiffs show a state of facts which will establish a fiduciary relation, or some such similar confidential relation, between the defendant, a

principal beneficiary, and the testator, then upon that showing the burden shifts. Not only this, but by proof of such a relation and such a bequest, the law indulges the presumption that undue influence has been used.'' [See Mowry v. Norman, 204 Mo. l. c. 189, 223 Mo. 463, 103 S. W. 15, 122 S. W. 724; Wendling v. Bowden, 161 S. W. l. c. 786; Turner v. Butler, supra, l. c. 749.]

II. The court below permitted the case to go to the jury upon both issues, i. e., of testamentary capacity and undue influence, having refused a peremptory instruction to find for the will, and having likewise refused mandatory instructions offered by defendant as to both said issues.

In this connection we may say generally, that it is well settled in this State that a will contest is an action at law, and that an appellate court will not reverse a judgment in such an action because the finding of the jury may perchance appear to it to be against the weight of the evidence. The question is not what the appellate court may think the finding of the jury should have been on the issue either of testamentary capacity or undue influence, but whether there is any substantial evidence in the record to support its finding. [See Wendling v. Bowden, supra, l. c. 787 and authorities there collated.]

*Of the issue of testamentary capacity.*

III. Our Supreme Court has frequently stated what should be applied as the test by which to determine whether or not one was possessed of sufficient mental capacity to make a will. We need, however, refer only to the more recent cases, in which that court said:

''To have a mind and memory enough to make a will, a testator should be able at the time to understand the ordinary affairs of life, the value and extent of his property, the number and names of the persons

who were the natural objects of his bounty, their deserts with reference to their conduct and treatment of him, their capacity and necessities. He should have active memory enough to retain all of these facts in mind, without the aid of others, long enough to have his will made. Otherwise the law takes from him the power to dispose of his property by will. A mind not coming up to that standard is not a testamentary one.'' [See Turner v. Anderson, 236 Mo. 523, 524; Bensberg v. Washington University, supra, l. c. 659.]

In the instant case, though the proponent made a prima-facie case, on the issue of testamentary capacity, there is much testimony tending to rebut the same and to show that the deceased, who was more than eighty years of age at the time of making the will, had not been of sound mind for some years prior thereto. Such is the tendency of the testimony of several witnesses, who resided in Carlinville, Illinois, and who knew Mrs. Balak before she moved from the latter place. It is true that much of the testimony of these witnesses is by way of their conclusions or opinions as to her mental condition, but they also testified to many of the facts and circumstances upon which their conclusions or opinions were predicated.

From the testimony it appears that Mrs. Balak's mental condition then was such as to attract the attention of those with whom she came in contact. She seems to have fancied that she had many troubles, and would constantly talk about her supposed troubles to her neighbors. It is said that she would sit and cry for hours telling others about the death of her husband years before, and of being left alone, though it appears that during this period she spoke well of her children; that she would constantly reiterate very much the same thing, and that much of her conversation was irrational and foolish.

She loaned a man in Carlinville two hundred dollars, which was afterwards repaid her, but there is tes-

timony to the effect that she became possessed of the idea, wholly without reason, that this man had agreed to take care of her for the remainder of her life, and that she was much incensed because he did not recognize such obligation.

One witness, who drove her to her home upon one occasion, testified that she did not know the direction in which her house lay, though near it, and insisted that he drive her in a direction opposite thereto. Another witness testified that she came to his house one day, as was her custom, and complained that she was so feeble that she could "barely get around;" that the witness's wife helped her down the steps slowly, when she started to go home, and led her out to the gate, as was frequently done, and that about ten minutes thereafter the witness saw her on another street chasing a rooster, and running after it as fast as he could have done.

Upon another occasion she put a little boy under a tub, and left him there screaming, because, as she said, he had been pouting. William Balak, as well as others, testified to this; and he said that later, when the subject arose in some way, his mother denied having done it. The witness said: "She got very wrathy about it, and she asked me about it in the presence of Mr. Susanka there at one time when he came up, and she wanted me to explain that and I says, 'Yes, mother you did that,' and she became kind of vexed about it and denied it and she told Mr. Susanka, 'Now, you see what is being done; such things as that is being made up on me and there is nothing to it; never done anything of that kind, but yet I have got to bear it.' " William testified also to many queer things which his mother did in connection with housekeeping, while she still lived in Carlinville and before he left there, which were quite at variance with her former habits. And he said that she had become very forgetful and her mind no longer had retention of even more important mat-

ters. Among other things he said: "She made a trip to St. Louis here; she visited my wife's parents, and at the time she was leaving here my mother-in-law was very dangerously sick, and on her going back the folks requested her when she comes back to kindly let us know, so that my wife can come down and see her mother, and they went that far that they bought her a return ticket. She came back home, she never said nothing about the folks, how they were getting along here, and until we found a return ticket by accident, I think it was my wife discovered it, we didn't know about it, and the subject come up, 'What did you bring this return ticket here for?' She says, 'Well, that's so. I forgot.' She says, 'I should have told you that Mary —my wife—is to go down there; her mother is very sick; I forgot all about it.' "

John testified that he became aware of his mother's failing mental condition before she left Carlinville, because of the queer things that she did and said upon his visits there, and particularly because of the filthy personal habits into which she had fallen. He testified as to some of the latter which were very filthy and offensive, and so disgusting that we prefer not to here relate them. He further said that earlier in life her habits had been quite to the contrary. He said that some years previously his mother had received a severe blow upon her head, inflicted by her husband, plaintiffs' father, who had become insane, and who, it seems, afterwards died in an insane asylum. And both sons testified that for years thereafter their mother had complained greatly of headaches and pains in her head, and often stated that she was losing her mind.

The deceased sold her home to a man living in Carlinville, who was a witness for plaintiffs. It is true that she appears not to have made a bad bargain. However, this witness says: "It seemed to me like her brother, Susanka, was her adviser." And

Balak v. Susanka.

when asked whether the deceased was not trying to get as much as she could for the house, the witness said: "She was trying to get as much as her brother advised her to ask for it." It also appears that her son John was there when the deal was closed; i. e., when the earnest money was paid to bind the bargain, the son intending to be back in a week or two when the balance of the purchase money would be paid; that a few days later, however, she came to the purchaser and said that her brother (the defendant) had said that they need not wait for her son John, whereupon the purchaser arranged to pay her the balance of the purchase price, this being done in the presence of "Squire Buillon," and an attorney for a building and loan association. Her queer actions and conversation convinced this witness that she was of unsound mind.

William Balak learned that his mother, while living in Carlinville, had executed a power of attorney to his brother John, authorizing the latter to collect an old note upon which she thought defendant was liable to her. It is conceded that this note had been paid many years prior thereto, and that the money was never due Mrs. Balak, but nevertheless she took the defendant with her to the office of a notary public where the power of attorney was executed; the defendant, the party against whom she proposed to institute suit, signing the power of attorney as a witness. It seems that his name, however, was afterwards erased, and the paper attested by another witness. With respect to this transaction William's testimony is that he went to see his mother about it for fear that she might thereby involve herself in trouble because of representations that she had made with respect to obtaining her pension. And his version of the matter is fully corroborated, so far as concerns what took place when he was with his mother, by another witness who was present at the time, and there is no evidence, having any probative force, to the con-

trary. It seems, however, that the mother became possessed of the idea that her son William was endeavoring to send her to the penitentiary; and that she always thereafter entertained this delusion. And on this account she became unfriendly toward him, and would have nothing to do with him. He says that the last time he saw her she was crossing a street in St. Louis, apparently much excited, with dress sleeves rolled up and throwing her arms up and down and talking to herself.

As we have said, John testified that while his mother lived with him in the city of St. Louis, she consumed large quantities of intoxicating liquors, viz., whiskey and gin, which were supplied her by the defendant. This witness asserted that defendant brought her about an average of a pint of liquor a day, which she would drink at all hours during the day and night; that she would get up at night and drink gin in tea or coffee, and repeatedly stumble and fall over things in the house, and that it would be necessary to pick her up and put her to bed; and that she persisted in certain filthy and offensive personal habits. It appears that she came to his house about February 13, 1909, leaving perhaps six weeks later. What she consumed in the way of intoxicating liquors thereafter may be inferred only from the testimony of witnesses to the effect that the defendant continued to supply her therewith, that she obtained whiskey regularly from others, and that she was repeatedly intoxicated.

One witness to whose house she went regularly, after leaving her son's home, testified that one could always tell that she had been drinking. This same witness testified that Mrs. Balak would come to her yard, ''knock on the bricks with her cane and start to scold and holler and talk about her children, and every time she came it was the same old song.'' That the deceased said that her brother always brought her a gallon of gin, and that she begged the witness's mother

to get whiskey for her, which the witness's mother did for a time, about twice a week "until she was ashamed to go for it;" that when deceased became intoxicated she "spoke awfully loud" and attracted the attention of the neighbors.

This same witness further stated that deceased was of unsound mind, telling of her irrational talk and actions. It seems that at one time she imagined that her room was infected with "chicken lice" and that "her head was full of lice," and became angry when none were discovered; that upon one occasion she wanted to give something to the little daughter of a lady who had befriended her in some way, and that she purchased two yards of calico, one of gray and the other of blue, out of which to make the child a dress; and became incensed because the child's mother would not thus use it. Upon another occasion, when asked why she did not quit drinking so much and eat something, she said that she did not feel like going to market. The next day the witness purchased a live young rooster for her. It seems that she would not cook it, however, but put it in the cellar saying that it would lay eggs for her; and that when she came to reimburse the witness for the thirty-five cents which the latter paid for the chicken, she opened her pocket book containing some bills and seventy-five cents, but thought that she had not enough to settle the account. On another occasion when she came to the witness's house she pointed up to a church and said "Oh, that old cross over there at the church. They say that is pointing up to God. There ain't no God. They are devils, and I'm a devil, too."

Other witnesses testified to her use of intoxicating liquors during this period, and to the many irrational things she did.

After leaving John's house it appears that she conceived the idea that all of her children were against her, and that she repeatedly condemned them. On be-

half of defendant it was sought to be shown that the conduct of the sons was such as to merit their mother's attitude toward them during the latter period of her life. If, however, the testimony adduced by plaintiffs is to be believed, her attitude toward her sons was unwarranted, and would appear to be in part at least the result of the delusions of a disordered mind. It is true that the sons appear not to have visited her during the latter months of her life. It seems, however, that she had for a long time refused to have anything to do with William for the reasons mentioned above; and John testifies that after she left his house he found where she had gone and saw her, but that she would not talk to him or have anything to do with him. It seems that deceased had always been very fond of her daughter, Mrs. Rose, but that after coming to St. Louis she thought that her daughter had also turned against her because of her failure to receive letters from the daughter; a matter which we shall touch upon later, relative to the issue of undue influence.

Since we are concerned here with the question whether there was any substantial evidence that Mrs. Balak was incompetent to make a will, we have deemed it unnecessary to refer in any detail to the testimony offered on behalf of the proponent of the will, and here merely briefly advert thereto. The notary who drew the will testified that he thought that Mrs. Balak was of sound mind. He said: "To the best of my knowledge she was of sound mind. . . . I think she always knew what she was doing." The defendant himself said of her: "She was smart enough. . . . She was a good mind in everything." The defendant's son, Frank Susanka, testified that he had never heard his aunt, Mrs. Balak, say anything that wasn't "sensible," and that she acted as if she knew what she was talking about. Defendant's daughter, a Mrs. Huels, testified that Mrs. Balak's mind appeared to be perfectly sound. It was this witness's child who had

been put under a tub in Carlinville by Mrs. Balak, and the witness corroborated the testimony above referred to relative to this incident, including that to the effect that Mrs. Balak afterwards denied it. The other witnesses for defendant were two ladies who rented quarters to Mrs. Balak after she left her son's home, a man who moved her furniture when she left Picker Street, a lady who kept a little grocery store at which she dealt, and another who conducted a bakery where she made purchases. These witness did not observe anything to indicate to them that she was not of sound mind.

From what we have stated above as to the testimony adduced upon the issues of testamentary capacity, we think it quite apparent that there was ample evidence to make this question one for the jury. It is quite true that one may not have the mental capacity to transact business, and yet be competent to make a will. And personal eccentricities and oddities are not alone evidence of such mental disorder or deterioration as to render one incompetent of making a testamentary disposition of his property. [See Bensberg v. Washington University, supra.] However, it seems quite clear that there is here substantial evidence tending to show a lack of testamentary capacity on the part of the deceased.

In Knapp v. Trust Co., 199 Mo. 665, 98 S. W. 70, it is said: "A marked change in a person's habits and thoughts is evidence of mental unsoundness. Insanity is indicated by proof of acts, declarations and conduct inconsistent with the character and previous habits of the person." And in support of this the court proceeds to quote from Schouler on Wills (3 Ed.), p. 103, and Rood on Wills, Sec. 119.

In Holton v. Cochran, 208 Mo. 314, 106 S. W. 1035, what was said upon this question in Knapp v. Trust Co., supra, was again approved by the Supreme Court in an opinion by WOODSON, J., where evidence of a

marked change in the habits and mind of the testator, and the making thereafter of an "unnatural and unjust" will, were not only held to be substantial evidence to sustain a verdict against the will, but the court said that, had it been within its province to weigh the evidence, it would unhesitatingly have said that it preponderated in favor of the contestants.

And in Roberts v. Bartlett, 190 Mo. l. c. 697, 89 S. W. 858, some stress was laid upon the fact that whereas the testatrix formerly "had been tidy and dressy he became not only slovenly, but absolutely filthy in his person, and that his home was unfit for a decent human being to inhabit;" that he appeared utterly oblivious to his personal conditions and those of his home, refusing to make proper provisions for the care of his insane wife, failing to provide himself with proper clothing, etc.

In the instant case there is evidence tending to show that the deceased, contrary to her former mode of life, had become absolutely filthy and offensive in her personal habits and manner of living; that she had lost her former memory to the extent that she had become forgetful even of the more important affairs of life; that whereas she had formerly been on good terms with her children, she had later become entirely estranged from them; that whereas she had formerly been moderately addicted to the use of intoxicants, she had for a long time prior to the execution of the will used intoxicating liquors to such an extent as to give rise to the inference that her mental, as well as her physical, powers had become greatly impaired, as a result of chronic alcoholism. Such we say is the tenor of contestants' evidence. And coupled with this is the testimony of many witnesses to the effect that she had been of unsound mind for some years before her death, relating the various incidents referred to above, and other things respecting her appearance, manner, conversation and actions,

which caused them to believe that she was mentally unbalanced.

Appellant urged that the various incidents related by plaintiffs' witnesses merely tend to show eccentricities on the part of the deceased; and that taken separately none of them have a tendency to show mental incapacity to make a will. We are not prepared to agree with this, however, for some of them appear to be of a character that can be accounted for only upon the theory of an irrational mind. And it would be unfair to contestants "to pronounce judgment of insufficiency upon each matter of evidence," but the whole thereof should be considered connectedly. [See Wolfe v. Whitworth, 170 Mo. App. 1. c. 375, 156 S. W. 715.] So viewing such testimony, we think it undoubtedly tends to support the statements of the witnesses to the effect that Mrs. Balak's mind was not sound.

Appellant also contends that the evidence shows that Mrs. Balak, even in the later period of her life, was competent to transact business and that the evidence showed "extraordinary sagacity and shrewdness" on her part. A consideration of the testimony on this score shows, we think, that the tendency thereof is quite to the contrary; or at best that the evidence as to this was conflicting. So far as concerns her ability to comprehend and transact business affairs, all of the positive testimony on this score appears to indicate her incapacity in this respect. There is evidence that before she moved to St. Louis she was so forgetful about money in her possession that she would leave it lying around the house and be surprised to learn that she had so much on hand. As we have said, the transaction relative to the sale of her house appears to have been conducted on the advice of her son and her brother. The incident above related to the effect that she loaned some money to a resident of Carlinville, who repaid it, and that she, without reason therefor, conceived the idea that this man had agreed to

care for her for the remainder of her days, does not indicate a mind capable of transacting business. Neither does the testimony relative to her attempt to collect money from the defendant upon an old note. It is true that the mere fact that she conceived that defendant owed her, when he did not, would have no tendency to show that she was mentally unbalanced. Capable business men frequently do likewise. However, it here appears that this note had been paid some twenty-five years before; that it was never an obligation due her; and that in proceeding to collect it she summoned the alleged debtor, took him before a notary public, and had him attest the power of attorney by which she was authorizing suit to be brought against him. Such a proceeding is at least so unusual as to suggest a weakened or disordered mind, rather than business capacity.

And it is said that the deceased had certain business transactions with Mr. Klobasa relative to lending out a thousand dollars which she had on hand, and that she refused to purchase a deed of trust with it because she could not get more than five per cent, she insisting upon six per cent. There is, however, no positive testimony that she attended to this transaction herself. In fact Klobasa says, with reference to her visits to his office: "Most of the time she came with Mr. Susanka. I don't remember, but probably once or twice she came by herself. And there is positive testimony in the record to the effect that during this same period she was unable to count money so as to pay the sum of thirty-five cents for a chicken, declaring that the money which she had in her purse, much in excess of this amount, was insufficient therefor.

That she was able to purchase groceries, bread, etc., for her own use, at nearby stores, is a matter of small weight. It appears that there was never any attempt on the part of the small storekeepers to take

advantage of her; and that she had sufficient intellect to thus purchase something to eat, has little bearing upon the question of her capacity to make a will. And in this connection it may be inferred that her purchases were comparatively few and simple, for there was testimony to the effect that she ate but little and seemed to sustain herself in large part by the use of stimulants of one sort or another.

And further, as to this issue, it should be noted that there is much evidence tending to show that the estrangement between the deceased and her two sons, during the latter part of her life, was due to delusions entertained by her with respect to their conduct toward her. Certain it is that the evidence respecting her attitude towards her son William tends with much force to show that such was the product of a mere delusion on her part. As to the cause of her being hostile to this son, the only evidence in the record respecting the same—aside from the testimony of defendant as to Mrs. Balak's own declarations, which is without probative force so far as concerns this question—is to the effect that the idea which she had conceived that her son wanted to send her to the penitentiary was utterly without foundation. As we have said, this son's testimony as to what took place between him and his mother at the time in question was fully corroborated by a disinterested witness who was present. There is absolutely nothing to indicate that there was the slightest foundation in fact for her belief that her son was attempting to get her into trouble. The evidence is all to the contrary.

. So far as concerns her attitude towards her other son, John, there is evidence tending to show that this was brought about by her said son's refusal to allow her to remain at his home unless she turned over her money to him. This, however, is stoutly denied by John. And the evidence respecting the matter fails to otherwise show what actually took place between

him and his mother. Whatever may be said of the testimony *contra,* we think it cannot be doubted that there was substantial testimony in support of plaintiff's contention in this regard, in view of the positive testimony given by John that he had no such difficulty with his mother and that her leaving his house was due to his efforts to prevent her from being kept under the influence of intoxicating liquor, supplied by defendant, and that the latter induced her to leave.

Touching this matter in general, it may be well to say that in order for one to understand the natural objects of his bounty and their deserts with reference to their conduct and treatment of him, he must necessarily be able to contemplate them with a mental vision free from and unaffected by the delusions or false beliefs of a disordered mind. [See Bensberg v. Washington University, supra, l. c. 659.] And in the case before us we think that whether Mrs. Balak's mind was thus affected was, under the evidence, clearly a question for the jury.

And we may say further that Mrs. Balak's sister was shown to be insane at the time of the trial, which had some tendency at least to indicate a predisposition to insanity in the family. And, as shown above, the evidence respecting Mrs. Balak's death is such as to justify the inference that she committed suicide. [See Holten v. Cochran, supra, l. c. 425.]

It is pointed out by appellant that "the fact of competency is to be decided by the state of the testator's mind *at the time* the will was made." [Von De Veld v. Judy, 143 Mo. l. c. 363, 44 S. W. 1117; Winn v. Grier, 217 Mo. l. c. 450, 451, 117 S. W. 48.] But, as is said in those very cases, evidence is always admissible of prior and subsequent occurrences tending to shed light upon the question of testamentary capacity at the time of the execution of the will. And it does not by any means follow that there must be direct and positive proof of testamentary incapacity at the very

time of the execution of the will. Proof of insanity or mental incapacity permanent in its nature (and especially where progressive) raises a presumption of the continued existence thereof, which it is incumbent upon the proponent to rebut in order to establish the nonexistence thereof at the precise time of the execution of the instrument in controversy. And substantial evidence of mental incapacity of such a character, together with evidence of the proponent to the contrary, should generally be sent to the jury in order that they may resolve the conflict in such evidence. [Byrne v. Fulkerson, 162 S. W. l. c. 179; Buford v. Gruber, 223 Mo. l. c. 253, 122 S. W. 717.]

And it is pointed out in Byrne v. Fulkerson, supra, that the Von De Veld case is not an authority for the conclusion that the evidence is insufficient in a case of this character to take the issue of testamentary capacity to the jury; for in the latter case the peculiarities attributed to the testator were observed while he was under the influence of fever and drugs, the cause appearing to be temporary, and there was abundant evidence of competency on the date the will was made. Likewise the facts in Winn v. Grier, supra, are distinguishable from those in the case before us, as they are said in the Byrne case to be unlike the facts there shown in evidence.

In the case before us, the evidence on behalf of contestants tended to show a slow and gradual weakening and impairment of Mrs. Balak's mental faculties, progressive in nature, and resulting, anterior to the execution of the will, in a permanent mental incapacity. No expert testimony was offered, and the precise character of her malady is not defined. It would seem, however, that the tendency of contestants' evidence is to indicate that she was suffering from *senile dementia,* which became more pronounced with her advancing years. [See Byrne v. Fulkerson; Holton v. Cochran, supra.] And while there was no direct evidence of her

mental incompetency at the very time of the signing of the will, there was not only evidence tending to show incompetency of a permanent character, existing prior to the period during which she lived alone in the city of St. Louis, but as to the latter period, during which the will was made there was testimony of several witnesses tending to show the continued existence of such incompetency.

It cannot be doubted we think that the case was clearly one for the jury upon the issue of testamentary capacity.

*Of the issue of undue influence.*

IV. It is strongly urged by learned counsel for appellant that there was no substantial evidence to take to the jury the issue of undue influence; but a careful examination of the record has not convinced us of this. We have above referred to much of the testimony which relates to this issue, and but little further needs to be added here. The deceased was quite old, had become feeble and childish, and it appears that her mind had undoubtedly become so far weakened and impaired as to render her readily susceptible to the influence of one in the position of defendant when the will was made. There is evidence tending to show that the defendant had possessed an influence over her for a long time prior to the execution of the will, and that he ultimately exercised it in his own behalf. It appears that even when she lived in Carlinville he advised her as to her business affairs. There is evidence that he was instrumental in having her come to St. Louis; that thereafter he visited her almost if not daily while she was at her son's house; and that he, against the son's wishes, kept her supplied with intoxicants, so that, if plaintiff's evidence be true, she was perhaps constantly under the influence of intoxicating liquor; that after she left her

son's home he rented her quarters for her, saw her almost daily, supplied her with intoxicants, and was the only one whom she would entrust with her money and to whom she looked for counsel and advice.

It is asserted that he had long sought to poison her mind against her children; that when the father was alive he would not permit defendant to interfere in these matters, but that after the former's death she fell under defendant's influence.  There is testimony to the effect that before she left Carlinville, defendant importuned her to make a will cutting out William, against whom she was prejudiced because of her belief that he had sought to put her in the penitentiary. It seems, however, that such was not then her wish, for she made no will at that time; and Mrs. Rose testified that when she last saw her mother, in 1908, the latter said that whatever she had would go to her children.

One witness testified that while Mrs. Balak lived in quarters rented for her by defendant, the latter wanted a lady living in the neighborhood to take her, saying: "She fell in the cellar and she always thinks that she can come here to stay with you;" that upon being told that this could not be done because of her drinking, defendant said: "Oh, well, she always did drink. Just let her drink till"— At which point defendant broke off abruptly without completing the sentence.

Further testimony is that he notified none of the plaintiffs of her death, leaving them to learn of it through others; that he at once took possession of all of her effects, and that shortly thereafter he sang a Bohemian song and danced, or jumped about, saying that his sister's money had been willed to him and that the children (as the witness testifying to this said) "couldn't do him nothing."

It appears that Mrs. Balak had great affection for her daughter, Mrs. Rose.  The latter testified that she wrote her mother a number of letters during the

period subsequent to the time when her mother left John's house; and that she received no response to any of such letters. As the mother could not read or write English, and the daughter was not versed in the Bohemian language, the former was entirely dependent upon others to write her letters and to read those that she received from her daughter. John testified that after his mother left his house two letters came, addressed to her, from her daughter, and that he gave these to Frank Susanka, defendant's son. It appears that Mrs. Rose also wrote her other letters, but got no response; and there is considerable testimony to the effect that during this very period Mrs. Balak repeatedly complained because she had not heard from her daughter. It would serve no useful purpose to rehearse in detail the evidence respecting this matter, but suffice it to say that during the period in question it appears that Mrs. Balak was unable to hear from her daughter, who, it seems, had always theretofore written her regularly, while on the other hand there is testimony of the daughter to the effect that she continued to write her mother and was unable to get any response from her, though her letters, which bore a return address, were not returned to her. Considering that Mrs. Balak depended largely upon defendant, and the latter's children, in such matters, during this time, it would appear that the charge which contestants make that the daughter's letters were suppressed finds some support, at least, in the inferences which may be drawn from the evidence adduced respecting this matter.

It is true that undue influence necessary to overturn a will must be such influence as amounts to overpersuasion, coercion, fraud or force, substituting the will of another, in lieu of that of the testator. [Gibony v. Foster, 230 Mo. 106, 130 S. W. 314; Winn v. Grier, supra; Turner v. Anderson, supra; Teckenbrock v. McLaughlin, 209 Mo. 551, 108 S. W. 46.] "Proof

of influence alone is not sufficient. It must be *undue.*" [Turner v. Anderson, supra.] And the mere existence of an undue or improper influence, but not exercised by the person possessing it upon the mind of the testator with respect to the making of the will in controversy will not vitiate the latter. [Turner v. Butler, supra.] It is not necessary, however, that the existence and exercise of an undue or improper influence be shown by direct and positive testimony, but the same may be inferred from facts and circumstances shown in evidence. [See Naylor v. McRuer, 248 Mo. l. c. 459, 154 S. W. 772; Turner v. Anderson, supra; Meier v. Butcher, 197 Mo. 68, 94 S. W. 883.] Or, as said by FARIS, J. in Naylor v. McRuer, supra, l. c. 459: "In the very nature of the case, if such influence be exerted, it will most naturally be brought to bear in secret and not in the light. That undue influence may be shown by circumstantial evidence, as well as by direct evidence, we have no doubt. This would seem to be so from the very nature of the case, and to be almost a rule to be deduced *ex necessitate.* On this point LAMM, J., speaking for this court in the case of Turner v. Anderson, 236 Mo. 541, used this language: 'There must be evidence that such influence (i. e. undue influence) was brought to bear, and that the effect was produced or sprang naturally by way of inference from the facts proven. Conceding that undue influence cannot as a rule be proven by direct and positive testimony, but oft must need rest in inferential truth,' etc."

In the instant case it seems quite clear that the evidence adduced on behalf of contestants tends to prove that the defendant not only possessed an influence over the testatrix, but that he actually exercised it in and about the making of her will by which he was left all that she possessed; and that in the enfeebled and failing condition of her mind such influence, so exercised, may properly be said to have

amounted to fraud or a species of coercion, and to have been undue. Such is the effect of testimony tending to show that the defendant sought to have her look to him for advice and counsel with respect to her affairs, to the exclusion of her children, until he became her sole adviser and confidant; that he kept her supplied with large quantities of intoxicating liquors, which she drank to such excess as to further benumb and impair her mental faculties; and that while she was in such condition mentally as to suggest incapacity to make a will, he accompanied her to the notary's office and actively took part in making the will, both by conversing with her with respect thereto and by telling the scrivener what was to go into it.

It is claimed that the evidence shows that Mrs. Balak's children had all mistreated and deserted her, while defendant alone had aided and comforted her during her declining years, and that these were the considerations which moved her to make a will entirely in defendant's favor. As to this, it may be quite true that Mrs. Balak was possessed of the idea that all of her children had turned against her, but there is ample evidence from which it may be inferred that this was not wholly without a malign influence on defendant's part. If all that defendant claims as to John's treatment of her be granted, it does not follow that if left wholly to her own inclination, without artifice or designing influence on defendant's part, she would have willed all she possessed to defendant; for it seems that she had always been specially fond of her daughter; and though in 1907 she had become incensed at William, it appears that, though importuned to disinherit him on this account, she indicated no intention of doing so, but it is said told her daughter, in 1908, that her property would go to her children.

And appellant asserts that the evidence merely tends to show that Mrs. Balak and the defendant were

fond of each other, as brother and sister, and that such influence as he may have possessed over her sprang merely from love and affection. But whatever may be said of the proponent's evidence on this score (which is not indeed very persuasive), certain it is that there is evidence on behalf of contestants tending strongly to show a sinister motive on her part of defendant—that his design was to ultimately become the possessor of his sister's property. His apparent willingness to let her hasten the end by the excessive use of intoxicants, and the testimony to the effect that shortly after her death, when a fond brother would naturally be affected with grief, he sang and danced, or jumped about, evidencing great delight over the fact that she had willed him all of her property and that her children could do nothing to him, to say nothing of the inferences which may be drawn from other testimony in the case, would tend with considerable force to indicate a mercenary motive throughout, rather than fondness and affection for his sister; though it may be that she was deluded on this score.

It is unnecessary for us to place our holding upon the ground that such a confidential relation was shown to exist between the defendant and Mrs. Balak as to cast upon the former the burden of rebutting the presumption of undue influence thus arising; for the case was not tried below upon the theory that proponent carried such burden. That there was evidence—and substantial too—having a tendency to show that the will was the product of undue influence exerted upon the mind of the deceased by the defendant, we think cannot be doubted. When we consider all of the evidence relating to this issue, and that defendant is said to have been a man of strong will, while the deceased was in a weakened and enfeebled condition mentally, if not in fact insane, at the time of the execution of the will, there would appear to be no room for doubt or dispute as to the propriety of sending this issue

to the jury whatever evidence there may be on the part of the proponent tending to overcome the showing made by contestants. We are unable to see how we could say that there is here *no evidence* of undue influence. [See Turner v. Butler, supra, l. c. 750; Carlson v. Lafgram, 250 Mo. 527, 157 S. W. 555; Turner v. Anderson; Mowry v. Norman; Naylor v. McRuer; Meier v. Butcher, supra.]

V. The only remaining point which we need to notice pertains to instruction No. 3 given for plaintiff. This instruction, among other things, told the jury that if they believed from the evidence that defendant, *"or other person or persons in his behalf, . . .* controlled, directed, retained or coerced the will or confused the mind of the testatrix, . . . or confused or overcame her power of judgment upon the true relations between herself and those who were the natural objects of her bounty," so that the instrument in question did not express her will and desire in the disposition of her property, they should find against the will.

This instruction is assailed upon the ground that it was error to employ therein the words which we have italicized above, for the reason that the instruction thereby enlarged the issues made by the pleadings. But the charge in the petition that the will was the product of undue influence exerted by the defendant is broad enough to include any such influence exercised by him, either directly, or through other persons, if any, whom he may have utilized to that end. We think that the instruction is not beyond the scope of the pleadings. And in view of the evidence adduced we do not see how the substantial rights of the defendant could well be said to have been prejudiced by the use of these words in the instruction, so as to call for a reversal of the judgment.

It follows that the judgment should be affirmed; and it is so ordered. *Nortoni, J.,* concurs; *Reynolds, P. J.,* dissents in a separate opinion.

## DISSENTING OPINION.

REYNOLDS, P. J.—I am unable to agree with the majority of my brethren in the result reached in this case.

I think instructions three and four should not have been given. Instruction three was error in including the words underscored by my Brother ALLEN in the fourth paragraph of his opinion, that is, the words "or other person or persons in his behalf," when referring to undue influence. The undue influence charged in the petition is by defendant and there is no charge that any one exerted influence in his behalf. So far as influence by others goes, the only evidence as to that is that all those near the testatrix appear to have been hostile to defendant. There is not a particle of evidence in this case, as I view it, tending to show that any "other person or persons," in behalf of defendant, had influenced or coerced in any manner whatever the mind of the testatrix in favor of defendant.

I think the fourth instruction was erroneous as contrary to what is said by our Supreme Court in Turner v. Butler, 253 Mo. 202, 161 S. W. 745, l. c. 748.

Over and above all this, I am compelled to say that I cannot put the construction upon the evidence that my learned Brother ALLEN does. With great respect for his opinions, I think he has unduly magnified incidents and displayed them in a stronger light than, on my view of it, the testimony in detail, or as a whole, warrants. I am clearly of the opinion that there is no substantial evidence in this case going to proof of a lack of testamentary capacity.

Our Supreme Court, in Couch v. Gentry, 113 Mo. 248, l. c. 255, 20 S. W. 890, has announced the rule to be applied in determining testamentary capacity. Briefly, it is there stated that if a testator understands the business about which he was engaged when he had his proposed will drawn and when he executed it, knew the persons who were the natural objects of his bounty and understood his relation to them, and knew what property he had and the disposition he desired to make of it, he possesses sufficient mental capacity to execute a valid will. [Cash v. Lust, 142 Mo. 630, l. c. 638, 44 S. W. 724.] So it has been held in many other cases by our Supreme Court. We find the same rule of decision in other jurisdictions. Thus, in Redfield's American Cases upon the Law of Wills (Ed. of 1874, p. 262), the case of Potts v. House, 6 Ga. 324, is given at length and is referred to as having been "more extensively quoted than almost any other in the American Reports, upon the subject of testamentary capacity." I refer to it on that as also on the matter of undue influence. The cases there cited and quoted exhibit eccentricities in a greatly exaggerated form, much greater than here in evidence, but the wills were sustained. [See particularly, Redfield, supra, pp. 271 to 279, and Heirs of Lee v. Executor of Lee, 4 McCord (South Carolina) 183.]

But it is said the testatrix was so addicted to the use of intoxicants as to render her incapable of making a will. In Peck v. Cary, 27 N. Y. 9, it is said that "in order to avoid a will made by an intemperate person, it must be proved that he was so excited by liquor, or so conducted himself during the particular act, as to be, at the moment legally disqualified from giving effect to it." There is no evidence that when testatrix made this will she was under the influence of liquor.

In the present case there is not a particle of testimony, as I read it, which tends to show that in

the case of this old lady, the testatrix, she can be classed as one afflicted with senile dementia. As she advanced in years naturally her mental faculties were weakened. But we cannot say that old age incapacitates one from making a will. [Collins v. Townley, 21 N. J. Eq. ·353; Sechrest v. Edwards, 4 Metc. (Ky.) 163.] In this respect the facts here in evidence are totally dissimilar to the facts in Knapp v. St. Louis Trust Co., 199 Mo. 640, l. c. 665, 98 S. W. 70, and Holton v. Cochran, 208 Mo. 314, 106 S. W. 1035, referred to and relied upon by my Brother ALLEN.

As I read the testimony it shows beyond contradiction that from the time she left her son's house in March to the day of her death, nearly two years thereafter, the testatrix had attended to her own affairs, looked after the investment of her own money; invested it. While she exhibited many of the irascible traits that sometimes accompany old age, and drank liquor, and her brother, at her request, often bought it for her, is no evidence that she made her will while she was under the influence of liquor. Not a word of testimony even suggests that the testatrix was then under the influence of intoxicants, or that her mind was permanently affected by their use. The garrulousness of old age may have been exhibited; nothing more.

Another point that I think my learned Brother has overlooked is this: The great mass of the testimony introduced to show mental aberration was as to events which occurred long prior to the time the testatrix left the house of her son, which was in March, 1909. They occurred either while she was a resident of that house, or long before. She left her son's house in March, 1909, and this will was executed November 30, 1909, the old lady dying December, 1910.

It is true that a number of witnesses testify that in their opinion she was insane, but when tested by the facts which they relate, I cannot conclude that this gave probative force to their testimony. Opinions of

nonexperts are of no probative force whatever unless supported by facts upon which to predicate them. [Crowson v. Crowson, 172 Mo. 691, 1. c. 702, 72 S. W. 1065.] As said in that case, so here: "These statements were mere opinions of nonexperts without a single fact upon which to predicate them. There was no attempt by the testator to transact any business at that time other than to make his will, and his directions with respect thereto to (Mr. Klobasa here) who wrote it showed that he had a clear perception of what he was doing, and what disposition he was making of his property." There was no expert testimony in the case at bar, and I do not think that the facts upon which the nonexpert opinions are predicated give any support to them.

Without going into this question of undue influence any further, I cannot bring myself to believe that there was testimony in the case warranting the court to submit that issue to the jury. It is true that actions contesting the due execution of a will are to be tried as actions at law, but it is also true that in all like cases our Supreme Court has looked with great care at the evidence—not weighing it, but to see that wills are not overturned on slight evidence, and has been exceedingly free in passing upon the evidence and in determining the correctness of the result arrived at, in many cases confirming the action of the trial court in directing the jury to find for the will, and in others, on a review of the evidence by the Supreme Court, that court has sent them back to the trial court with directions to enter a verdict sustaining the will. As, see Sayre v. Trustees of Princeton University, 192 Mo. 95, 90 S. W. 787; Teckenbrock v. McLaughlin, 209 Mo. 533, 108 S. W. 46; Crum v. Crum, 231 Mo. 625, 132 S. W. 1070. This, not on the weight of evidence but for lack of substantial evidence. Wills are solemn acts; the last act, usually, and are not to be overturned save on substantial evidence, for the law recognizes the

right of every one, even if possessed of but little business acumen, to dispose of his property as he chooses. He is the one to make his will, not his neighbors sitting as a jury, whose inclination often is to think they could have made a better will. [Dodge v. Williams, 46 Wis. 70; Cited In re Connor's Estate, 254 Mo. 65, 162 S. W. l. c. 259.] I hold that on the issue of mental capacity, and under the evidence as to that, the court should have instructed the jury to find for the proponents of the will.

On the issue of undue influence, I am compelled to say that my reading of the testimony satisfies me that there is not a particle of substantial testimony even tending to show any undue influence exercised upon the mind of the testatrix by her brother, the beneficiary, at the time she executed the will. In Turner v. Butler, supra, it is said: "The law does not look with disfavor on the loving performance of those filial offices which, while not exacted by it, are the real rewards of parental solicitude and sacrifice; nor does it discourage the substantial recognition of those affectionate services. These principles apply as well to relations having their origin in marriage as in consanguinity; and confidential relations of this character may often explain why the testator has desired to bestow generously upon the beneficiary of his will." [See also Berberet v. Berberet, 131 Mo. 399, 33 S. W. 61, and Tibbe v. Kamp, 154 Mo. 545, 54 S. W. 879, 55 S. W. 440.] The defendant and the testatrix were old people, each of them over eighty years of age. I am unable to find in any testimony in the case evidence of any undue influence on the part of the brother, undue influence dominating the will of the testatrix and unduly exercised at the very time of making the will. [Jackson v. Hardin, 83 Mo. 175.] Defendant and testatrix were brother and sister. Their relations were close and affectionate. It was but natural to expect that one would have influence over the other.

But that it was undue and active in procuring the will, I am unable to see. Nor do I understand that it was at the solicitation of the brother that the old lady removed from Carlinville and came to St. Louis. As I read the testimony that was at her own persistent request, and when her brother found she had her heart set on it, he persuaded the son to provide a place for her in his home and assisted her to move. I find no evidence of undue influence in this on the part of the brother. The fact that he did not care for her in his own house, is of no significance, for the evidence shows that the old lady preferred to be by herself; to have her own home.

It is true that there is evidence that when the testatrix had her will drawn up by Mr. Klobasa, her brother was with her and that they did talk over the matter of the will together in the presence of Mr. Klobasa. But there is no evidence that the brother then made any suggestions as to it, or in any way influenced her by any word or act.

Nor can I understand how the fact that after the death of his sister the brother exhibited satisfaction and elation over the fact that he was her beneficiary, has any probative force as establishing undue influence.

Without extending these remarks any further, I repeat, that I am entirely unable to agree to the conclusion arrived at by the majority of the court in this case, and think the judgment should be reversed and the cause remanded to the circuit court with directions to enter up a verdict establishing the paper produced as the last will and testament of Josefa Balak.